Anna VALMONTE, Individually, and on behalf of all others similarly situated, Plaintiff–Appellant,

v.

Mary Jo BANE, As Commissioner of the NYS Dept. of Social Services, J. Daniel Bloomer, As acting Commissioner of the Orange County Dept. of Social Services, Defendants–Appellees.

No. 169, Docket 93–7183.

United States Court of Appeals, Second Circuit.

Argued Sept. 2, 1993.

Decided March 3, 1994.

Carolyn A. Kubitschek, Lansner & Kubitschek, New York, NY, for plaintiff-appellant.

Judy E. Nathan, Assistant Attorney General, New York, NY, (Robert Abrams, Attorney General of the State of New York, Albany, NY, of counsel), for defendant-appellee Mary Jo Bane.

Stephen Toole, Senior Assistant County Attorney, Orange County, NY (Stephen Hunter, County Attorney, Orange County, NY, of counsel), for defendant-appellee J. Daniel Bloomer.

Before FEINBERG, CARDAMONE, and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Plaintiff-appellant Anna Valmonte appeals from a judgment of the United States District Court for the Southern District of New York (Conboy, *J.*) dismissing under Fed. R.Civ.P. 12(b)(6) her claim brought under 42 U.S.C. § 1983. Valmonte brought her claim against the Commissioner of the New York State Department of Social Services and the Commissioner of the Orange County Department of Social Services (collectively "the appellees" or "the state") alleging that their inclusion of her name on the New York State Central Register of Child Abuse and Maltreatment ("the Central Register" or "the list") violated her Fourteenth Amendment right of due process. Valmonte's amended complaint raised numerous challenges to the statutory scheme of the Central Register.

Following a motion to dismiss, the district court granted the motion in part and denied it in part, dismissing most of Valmonte's claims. *Valmonte v. Perales,* 788 F.Supp. 745, 755 (S.D.N.Y.1992) (summarizing holding) ("*Valmonte I*"). The district court denied the motion with respect principally to Valmonte's claim that she had stated a cause of action alleging that the state's publication of Valmonte's status on the Central Register to prospective employers violated her due process rights. *See id.* at 752–53. Subsequently, the district court *sua sponte* reconsidered the motion to dismiss, and dismissed all of the claims. *See Valmonte v. Bane,* 812 F.Supp. 423, 426 (S.D.N.Y.1993). Valmonte has now appealed.

The major issue presented in this appeal is whether the state's maintenance of a Central Register that identifies individuals accused of child abuse or neglect, and its communication of the names of those on the list to potential employers in the child care field, implicates a protectible liberty interest under the Fourteenth Amendment. If so, we must also determine whether the state's statutory procedures established to protect the liberty interest are constitutionally adequate.

For the reasons stated below, we hold that the dissemination of information from the Central Register to potential child care employers, coupled with the defamatory nature of inclusion on the list, does implicate a liberty interest. We also hold that the procedures established violate due process, primarily because the risk of error in evaluating the allegations against those included on the list is too great. Accordingly, we reverse the judgment of the district court, and remand for further proceedings not inconsistent with this opinion.

## BACKGROUND

Valmonte is attempting to represent a class of individuals whose names are listed on

the state's Central Register as a result of a finding by state or county Departments of Social Services ("DSS" or "the department") that they are in some way abusive or neglectful with regard to children. A full explanation of the nature of the statutory scheme establishing the Central Register is necessary for an understanding of the issues in this case.

## I. *Statutory Scheme*

Valmonte is challenging the state's system for collecting and storing information about allegedly abusive and neglectful individuals. Article 6, Title 6 of the New York Social Services Law governs the recording and investigation of reports of suspected maltreatment of children, and the administrative review process by which substantiated reports may be reviewed. *See* N.Y. Soc.Serv. Law § 411–428 (McKinney 1992) (as amended 1993) ("SSL"). The Central Register maintains reports of child abuse as part of a larger system to ensure the safety of children in New York, SSL § 411, and is maintained by both the state and various county departments of social services. SSL §§ 422(1), 423(1), 424(2).

### A. *Reporting and Initial Placement on Register*

The Central Register procedures are triggered by reports to the Central Register of suspected child abuse. *See generally* SSL § 415. The state DSS maintains a telephone hotline with a toll-free telephone number that is staffed full-time in order to receive complaints. SSL § 422(2)(a). State law places an affirmative duty on designated individuals such as health care workers, social workers, law enforcement agents, judicial officers, and education employees to report to the Central Register whenever they have reasonable cause to suspect that a child is maltreated. SSL § 413. Calls to the hotline can be made, however, by any individuals, not only those with affirmative duties of reporting.

Upon receiving a complaint of suspected child abuse, hotline operators must determine whether the allegations, if true, would be legally sufficient to constitute child abuse. SSL § 422(2)(a). If so, the operator records the complaint on paper and relays it to the appropriate county or local DSS. *Id.* The local DSS is responsible for investigating all complaints of suspected child maltreatment, SSL § 423(1), and must investigate the truth of the charges and complete an investigation within 60 days. SSL § 424(7).

At the conclusion of the investigation, the local department must determine whether the complaint is "unfounded" or "indicated." *Id.* Unfounded reports are expunged from the Central Register and all records destroyed. SSL § 422(5). If the local DSS finds that there is *"some credible evidence"* to support the complaint, the complaint is marked "indicated" and the individual who is the subject of the report is listed on the Central Register. *Id.;* SSL § 412(12). The Central Register accepts the findings of the county department, without making an independent determination.

### B. *Confidentiality of Central Register Determinations*

As noted earlier, the information in the Central Register is generally confidential. SSL § 422(12). The names of individuals on the Central Register are not publicly available, although there are numerous exceptions for, among others, public agencies, law enforcement personnel, and judicial officers. SSL § 422(4)(A).

More significant, for purposes of this case, are the statutory provisions requiring certain employers in the child care field to make inquiries to the Central Register to determine whether potential employees are among those listed. The purpose of these provisions is to ensure that individuals on the Central Register do not become or stay employed or licensed in positions that allow substantial contact with children, unless the licensing or hiring agency or business is aware of the applicant's status. Numerous state agencies, private businesses, and licensing agencies related to child care, adoption, and foster care are required by law to inquire whether potential employees or applicants are on the Central Register. SSL § 424–a(1). For purposes of simplicity, this group will be referred to as "employers," even though li-

censing agencies are included within that designation.

When such employers make an inquiry, the state DSS will inform the potential employer if the individual is the subject of an indicated report on the Central Register. SSL § 424–a(1)(e). The state DSS will not inform the employer of the nature of the indicated report, but only that the report exists. If the potential employee is on the list, the employer can only hire the individual if the employer "maintain[s] a written record, as part of the application file or employment record, of the specific reasons why such person was determined to be appropriate" for working in the child or health care field. SSL § 424–a(2)(a).

C. *Procedures for Appealing Initial Listing*

There are certain procedures established by the statutory scheme to allow individuals included on the Central Register to appeal their designation. When a local DSS finds that a report is "indicated," the subject of the report is notified and has 90 days to request that the report be expunged. SSL § 422(8)(a)(i). If a request is made, the state DSS is required to gather the material pertinent to the indicated report and conduct a two-step review. First, the state DSS must determine whether there is *"some credible evidence"* that the subject committed the acts charged. SSL § 422(8)(a)(ii). In the second step of the review, the state DSS must also ascertain whether the acts alleged could be "relevant and reasonably related" to the subject's employment in any child care provider area. *Id.*

If there is no credible evidence of child abuse or maltreatment, the state DSS must expunge the record and notify the subject. SSL § 422(8)(a)(iii). If there is some credible evidence, and the department finds that the allegations are reasonably related to child care, the department must deny the expungement request. SSL § 422(8)(a)(v). Finally, if there is some credible evidence of the act, but a finding by the department that the allegations are not reasonably related to child care, the report will not be expunged, but it will also not be disclosed to potential child care employers and licensing agencies. SSL § 422(8)(a)(iv).

If the expungement request is denied, an administrative hearing before the state DSS commissioner's office is scheduled (the "non-deprivation hearing"). SSL § 422(8)(a)(v). The burden of proof at this hearing is placed on the "child protective service or the state agency which investigated the report." SSL § 422(8)(b)(ii). The nature of the proof required at this hearing is functionally identical to that required for the initial expungement request: the local DSS must prove to the commissioner the allegations against the subject by some credible evidence, SSL § 422(8)(c)(1), and then must prove that the allegations are reasonably related to employment in the child care field. SSL § 422(8)(c)(ii).

The consequences of the hearing are substantially similar to those at the expungement hearing: if there is no credible evidence substantiating the allegation, the record is expunged, SSL § 422(8)(c)(i); if there is credible evidence, but the acts alleged are not reasonably related to child care, the department is precluded from notifying potential employers in the child care field of the complaint, SSL § 422(8)(c)(ii); finally, if there is some credible evidence and a finding that the acts are related to child care, the record will be maintained and will be available to child care provider agencies and employers. *Id.*

In this initial hearing, any state family court finding of abuse or neglect against the subject with regard to the allegations in the report creates "an irrebuttable presumption" that the allegations are supported by some credible evidence. SSL § 422(8)(b)(ii). The inverse, however, is not true: the fact that a case brought against the subject in state family court has been dismissed is not considered conclusive proof that there is no credible evidence of the allegations.

If the report is not expunged after the hearing, the subject of the report can commence a proceeding pursuant to Article 78 of the New York Civil Practice Law and Rules to challenge the decision. The court's determination of such a proceeding is made under

 **997**

the "arbitrary and capricious" standard usually applied to state agency determinations.

## D. Post–Deprivation Hearing

As noted earlier, certain employers and licensing agencies are required to ascertain whether potential employees or applicants are listed on the Central Register, and can only hire or license such applicants if they maintain a written record of their reasons for doing so. If the agency decides not to hire or license the individual, it must provide the individual with "a written statement setting forth whether its denial, failure to hire or failure to use was based, in whole or in part, on such indicated report, and if so, its reasons for the denial or failure to hire or failure to use." SSL § 424–a(2)(b)(i). Similarly, the termination of an employee who is the subject of an indicated report must be accompanied with a written statement setting forth whether the termination was based on the report. SSL § 424–a(2)(b)(ii).

If the reasons for the termination or refusal to hire include the fact that the applicant was the subject of an indicated report, that subject has the right to a post-deprivation hearing before the state DSS. At this hearing:

> the sole question before the department shall be whether the applicant ... who was denied access to the children cared for by a provider agency has been shown by a *fair preponderance of the evidence* to have committed the act or acts of child abuse or maltreatment giving rise to the indicated report.... The failure to sustain the burden of proof at a hearing held pursuant to this section shall not result in the expungement of an indicated report but shall be noted on the report maintained by the state central register and *shall preclude* the department from notifying a party which subsequently makes an inquiry to the department pursuant to this section that the person about whom the inquiry is made is the subject of an indicated report.

SSL § 424–a(2)(d) (emphasis added). At this post-deprivation hearing, therefore, the DSS bears the burden of proving the allegations not by "*some credible evidence*"—the standard for the initial determination by the local

DSS, the initial expungement request, and the non-deprivation hearing—but by a *"fair preponderance of the evidence."* The failure to reach that level of proof will not result in expungement, but will prevent potential employers or licensing agencies from knowing that the applicant is the subject of an indicated report.

Unless expunged earlier, an indicated report is finally expunged 10 years after the youngest child referred to in the report turns 18. SSL § 422(6).

## II. Valmonte's Case

Valmonte became entangled in this system on November 30, 1989, when she slapped her eleven year-old daughter Vanessa on the side of her face with an open hand. Valmonte states in her complaint that she slapped Vanessa because Vanessa had been caught stealing and other forms of discipline had not been successful. An unidentified employee at Vanessa's school made a complaint to the child abuse hotline that Valmonte had mistreated her daughter. Subsequently, child abuse investigators working for the Orange County DSS concluded that Valmonte had engaged in "excessive corporal punishment," marked the complaint against her as "indicated," and commenced child protective proceedings against her.

The New York state family court subsequently dismissed the child protective proceedings against Valmonte on the condition that the Valmonte family receive counselling. This dismissal, however, had no impact on Valmonte's inclusion on the Central Register.

During this time, Valmonte requested expungement of her indicated report from the state DSS. This request was denied. Valmonte then exercised her right to an administrative hearing before an agent of the state DSS. The state DSS again denied expungement, finding some credible evidence to support the allegations.

Subsequently, Valmonte brought an action in the district court challenging the constitutionality of the Central Register statutory scheme under 42 U.S.C. § 1983. The complaint contained numerous procedural due process claims, substantive due process

claims, and appended related state law claims. The defendant commissioners of the state and local departments of social services moved under Fed.R.Civ.P. 12(b)(6) to dismiss Valmonte's action for failure to state a claim upon which relief could be granted, principally because Valmonte failed to adequately show that she had a protected liberty interest that was implicated by the procedures of the Central Register.

On March 31, 1992, the district court granted in part and denied in part the defendants' motion to dismiss. *See Valmonte I,* 788 F.Supp. at 755. The court dismissed most of Valmonte's state law and federal claims, but declined to dismiss the claim that the publication of Valmonte's status on the Central Register to prospective employers implicated a liberty interest, and that the procedures set up to protect that interest were inadequate. *See id.* at 752–53. The court found that Valmonte had a liberty interest implicated in the stigma associated with her status on the list, and that the procedures established were not adequate, since the "some credible evidence" standard used at the first hearing left open the real possibility of error. *See id.* at 753.

Subsequently, the district court reversed itself *sua sponte* and dismissed all of Valmonte's claims. *Valmonte II,* 812 F.Supp. at 425. The reason for the reversal was the court's realization that the only persons who would have access to the Central Register were potential child care employers or a limited number of others statutorily authorized to receive the information. *See id.* The court noted that it had assumed in *Valmonte I* that there was a danger of public dissemination. *See id.* Without that danger, the court did not perceive the possibility of a liberty interest being implicated, and accordingly dismissed all claims. *See id.*

Valmonte now appeals, arguing principally that the state has deprived her of a legitimate liberty interest by disseminating to potential employers her placement on the Central Register list, and that the procedures established to allow her to challenge her designation are constitutionally inadequate.

## DISCUSSION

### I. *Does Disclosure Violate a Liberty Interest?*

Valmonte primarily argues that the state government has stigmatized her as a child abuser while simultaneously depriving her of her ability to seek employment. In reviewing the district court's dismissal of Valmonte's claim on a motion under Fed. R.Civ.P. 12(b), we accept the material facts alleged in the complaint as true. *See Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (per curiam). A court should only dismiss a suit under Rule 12(b)(6) if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The present question is whether Valmonte has a cognizable claim under the facts alleged in her complaint.

To formulate a claim under the Due Process Clause of the Fourteenth Amendment, a plaintiff must demonstrate that he or she possesses a constitutionally protected interest in life, liberty, or property, and that state action has deprived him or her of that interest. *See* U.S. Const. amend. XIV, § 1. The Supreme Court has established that "[w]e examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Department of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989) (citation omitted). We will undertake this examination following a discussion of the appellees' contention that Valmonte's claim is not ripe.

### A. *Ripeness*

■ The appellees contend that Valmonte's claim is not ripe, because Valmonte has not actually been deprived of employment or suffered any other injury. They argue that Valmonte has not made a showing that she has even looked for a job in the field

of child care, and that she has only alleged that she had been a "paraprofessional in the school system" in the past.

■ As Valmonte responds, however, it is not necessary that she wait until she is actually injured to file this suit. Valmonte does not need to "await the consummation of threatened injury to obtain preventative relief." *Pennsylvania v. West Virginia,* 262 U.S. 553, 593, 43 S.Ct. 658, 664, 67 L.Ed. 1117 (1923); *see Berger v. Heckler,* 771 F.2d 1556, 1563 (2d Cir.1985) (plaintiff need not wait until "consummation" of threatened injury in order to sustain suit). Her claim is ripe if the perceived threat due to the putatively illegal conduct of the appellees is sufficiently real and immediate to constitute an existing controversy. *See Blum v. Yaretsky,* 457 U.S. 991, 1000, 102 S.Ct. 2777, 2783, 73 L.Ed.2d 534 (1982).

In this case, Valmonte has sufficiently alleged facts that give rise to an existing controversy. We must accept as true Valmonte's assertions that she would look for a position in the child care field but for her presence on the Central Register. Should she apply for a position within the child care field, her chosen field, her potential employer will by operation of law automatically find out that she is named on the Central Register. If that happens, she will suffer at the very least the injury caused by the stigma of being placed on the list, and it is also likely that the employer will choose not to hire her due to her status.

Her presence on the Central Register, therefore, is a direct threat not only to her reputation but to her employment prospects. Under these facts, we agree with the district court that Valmonte's claim is ripe.

B. *Whether Valmonte has a Liberty Interest*

■ The central issue in this case is whether Valmonte has sufficiently alleged the deprivation of a protected liberty interest. Valmonte's strongest argument on this issue is that the state's dissemination of information from the list to potential employers in the child care field not only stigmatizes those on the list but also denies them employment in their chosen field.

The question of whether one's good name and standing, and the interest in protecting that reputation, constitutes a protectible liberty interest has been considered in a string of Supreme Court and Second Circuit cases. The Supreme Court held in 1971 that a protectible liberty interest may be implicated "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971). A year later, the Court held that a government employee's liberty interest would be implicated if he were dismissed based on charges that imposed "on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972).

*Constantineau* and *Roth* were followed a few years later by the Court's decision in *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), in which the Court held that damage to one's reputation is not "by itself sufficient to invoke the procedural protection of the Due Process Clause." *Id.* at 701, 96 S.Ct. at 1161. Rather, the Court held, loss of reputation must be coupled with some other tangible element in order to rise to the level of a protectible liberty interest. *Id.* We have previously interpreted this holding to mean that "stigma plus" is required to establish a constitutional deprivation. *See Neu v. Corcoran,* 869 F.2d 662, 667 (2d Cir.), *cert. denied,* 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989). Consequently, we will examine Valmonte's claim first to determine whether inclusion on the Central Register constitutes "stigma," and then to determine whether the "plus" requirement has been satisfied.

1. *Stigma*

■ Valmonte first must prove that her inclusion on the Central Register will result in stigma, that is, in "public opprobrium" and damage to her reputation. *See Bohn v. County of Dakota,* 772 F.2d 1433, 1436 n. 4

(8th Cir.1985), *cert. denied,* 475 U.S. 1014, 106 S.Ct. 1192, 89 L.Ed.2d 307 (1986). The district court found in both decisions that the disclosure of Valmonte's status on the list to prospective employers was enough publication to implicate her reputation. *Valmonte II,* 812 F.Supp. at 425 n. 1.

There is no dispute that Valmonte's inclusion on the list potentially damages her reputation by branding her as a child abuser, which certainly calls into question her "good name, reputation, honor, or integrity." *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707 (quoting *Constantineau,* 400 U.S. at 437, 91 S.Ct. at 510). The state contends, however, that there is no "stigma" attached to her inclusion because there is no disclosure of information on the Central Register except to authorized state agencies or potential employers in the child care field.

Dissemination to potential employers, however, is the precise conduct that gives rise to stigmatization. *See Brandt v. Board of Cooperative Education Services,* 820 F.2d 41, 44 (2d Cir.1987). In *Brandt,* we stated that if a plaintiff "is able to show that prospective employers are likely to gain access to his personnel file and decide not to hire him, then the presence of the charges in his file has a damaging effect on his future job opportunities." *Id.* at 45. In the instant situation, although Valmonte's presence on the Central Register will not be disclosed to the public, it will be disclosed to any employer statutorily required to consult the Central Register. Since Valmonte states that she will be applying for child care positions, her status will automatically be disclosed to her potential employers. Under *Brandt,* that dissemination satisfies the "stigma" requirement.

2. *"Plus"*

■ Because Valmonte has sufficiently alleged the defamation prong of the "stigma plus" test, we must now determine whether the second part of that test is met. As we have noted in the past, "it is not entirely clear what the 'plus' is." *Neu,* 869 F.2d at 667. Moreover, "[a]lthough *Paul* is the foundation for all subsequent cases dealing with

governmental defamation, its meaning is not unambiguous." *Id.* at 667.

In a long line of cases, summarized thoroughly in *Neu,* we have attempted to clarify the ambiguities left in the *Paul v. Davis* "stigma plus" requirement. *See Neu,* 869 F.2d at 667–69. We concluded in *Neu* that *Paul v. Davis* "strongly suggests" that defamation is not by itself a deprivation of a liberty interest unless coupled with the termination of government employment "or deprivation of some other legal right or status." *Id.* at 667. We did not clarify what that legal right or status might be, and it is worth noting that in *Neu* we were only called upon to determine, for purposes of deciding if qualified immunity applied, whether public officials had violated a clearly established constitutional due process right in allegedly defaming a businessman. *See id.* at 665.

The reasoning employed in *Neu* has been supported and reiterated by subsequent decisions by this Court. *See White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1063 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993); *Easton v. Sundram,* 947 F.2d 1011, 1016 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). Both cases were decided on qualified immunity grounds, *see White Plains Towing,* 991 F.2d at 1063–64; *Easton,* 947 F.2d at 1015–16, but both reaffirmed *Neu*'s holding that we have not previously clearly established that defamation occurring outside of the context of dismissal from government employment or termination of some other right or status constitutes a deprivation of a liberty interest. *See White Plains Towing,* 991 F.2d at 1063; *Easton,* 947 F.2d at 1016.

The appellees rely on these cases to support their argument that Valmonte has not sufficiently alleged the deprivation of a liberty interest. They argue that Valmonte was not terminated from government employment, or in any other way deprived of a legal right or status. Rather, they contend, Valmonte is simply asserting that she is unable to secure employment in the child care field because of her damaged reputation, which is precisely the sort of claim precluded by *Paul v. Davis.*

■ We agree that our prior decisions indicate, as does *Paul v. Davis,* that defamation is simply not enough to support a cognizable liberty interest. It therefore follows that the deleterious effects which flow directly from a sullied reputation would normally also be insufficient. These would normally include the impact that defamation might have on job prospects, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation. When the Supreme Court stated in *Paul v. Davis* that injury to reputation was not by itself a deprivation of a liberty interest, we presume that the Court included the normal repercussions of a poor reputation within that characterization. As the Supreme Court stated in a later case:

> Most defamation plaintiffs attempt to show some sort of special damage and out-of-pocket loss which flows from the injury to their reputation. But so long as such damage *flows from injury caused by the defendant to a plaintiff's reputation,* it may be recoverable under state tort law but it is not recoverable in a *Bivens* action.

*Siegert v. Gilley,* 500 U.S. 226, 234, 111 S.Ct. 1789, 1794, 114 L.Ed.2d 277 (1991) (emphasis added).

The instant case, however, presents an entirely different situation. Valmonte alleges much more than a loss of employment flowing from the effects of simple defamation. The Central Register does not simply defame Valmonte, it places a tangible burden on her employment prospects. Valmonte has alleged that because of her inclusion on the Central Register, and because all child care providers must consult that list, she will not be able to get a job in the child-care field. In other words, by *operation of law,* her potential employers will be informed specifically about her inclusion on the Central Register and will therefore choose not to hire her. Moreover, if they do wish to hire her, those employers are required by law to explain the reasons why in writing.

This is not just the intangible deleterious effect that flows from a bad reputation. Rather, it is a specific deprivation of her opportunity to seek employment caused by a statutory impediment established by the state. Valmonte is not going to be refused employment because of her reputation; she will be refused employment simply because her inclusion on the list results in an added burden on employers who will therefore be reluctant to hire her.

■ We do not believe that this holding is in any way inconsistent with our previous holdings in *Neu, White Plains Towing,* or *Easton.* In those cases, the plaintiff averred only that simple defamation by public officials had resulted in a poor reputation that made it less likely that he would be hired in the future. *See White Plains Towing,* 991 F.2d at 1063 (characterizing plaintiff's argument as seeking to prove "stigma plus" for potential injury to reputation combined with status as contractor for state); *Easton,* 947 F.2d at 1015 (stating that plaintiff's argument was that "he was fired from his job and defamed in a way that will interfere with future job possibilities"); *Neu,* 869 F.2d at 664 (summarizing allegations by plaintiff that officials "foreclosed a range of career opportunities and deprived him of the ability to engage in his occupation"). Under *Paul v. Davis,* this is not enough to support the finding of a liberty interest. Moreover, we note that the posture of those cases—in which we were only called upon to determine whether the law clearly established a deprivation of liberty due to defamation—was such that we never actually decided whether a loss of employment opportunity due to defamation by public officials constituted a deprivation of a liberty interest. *See Easton,* 947 F.2d at 1015 (stating that "[w]e need not decide the issue of whether or not Easton adequately alleged deprivation of a liberty interest"); *Neu,* 869 F.2d at 665 (stating that "we do not decide" matter of deprivation of liberty interest). Those cases present very different situations from this one, since in those cases there was no statutory impediment to the plaintiffs being hired in the future.

Those three cases recognized that defamation in conjunction with termination of government employment is the clear situation that satisfies the "stigma plus" test, mainly because that was the situation recognized in *Roth,* prior to the decision in *Paul v. Davis.*

*See, e.g., Neu,* 869 F.2d at 667. None of those cases, however, foreclosed the possibility that the "plus" could come from some other independent deprivation. Here, the fact that the defamation occurs precisely in conjunction with an individual's attempt to attain employment within the child care field, and is coupled with a statutory impediment mandating that employers justify hiring the individual, is enough to compel a finding that there is a liberty interest implicated.

Here, the injury associated with the Central Register is not simply that it exists, or that the list is available to potential employers. The deprivation stems from the fact that employers *must* consult the list before hiring Valmonte, and if they choose to hire her must state the reasons in writing to the state.

We recognize that this is a unique situation, not previously considered in the case law. We also recognize that the Supreme Court has given indications that perhaps only those who are defamed while in the course of being terminated from government employment can state a cause of action for deprivation of a liberty interest. *See Siegert,* 500 U.S. at 241–42, 111 S.Ct. at 1798 (Marshall, J., dissenting) (criticizing majority opinion for suggesting that "reputational injury deprives a person of liberty only when combined with loss of *present* employment, not *future* employment"). This statutory scheme is unique, however, in that there will be no question in most cases whether the individual's inclusion on the Central Register was a causal factor in the individual's failure to secure employment, because SSL § 424–a(2)(b)(i) requires that employers notify potential employees if they have been denied employment because of their presence on the list. Therefore, individuals on the Central Register who lose employment opportunities would have received offers *but for their inclusion on the list.* We do not, in such a case, see much of a difference in the distinction between losing one's established position in government employment because of defamation, and losing one's prospective position in government or a government-regulated field precisely because of the defamation.

We hold that Valmonte has adequately stated a cause of action for deprivation of a liberty interest not merely because of the defamatory aspect of the Central Register, but because that defamation occurs in conjunction with a statutory impediment to employment. In this case, we find that the requirement that puts burdens on employers wishing to hire individuals on the list results in a change of that individual's status significant enough to satisfy the "plus" requirement of the "stigma plus" test.

## II. *Procedural Due Process*

Even though the Central Register implicates Valmonte's liberty interest, Valmonte still must show that the procedural safeguards of her interest established by the state are insufficient to protect her rights. Valmonte argues that the existing procedures violate due process by prohibiting expungement of a subject's indicated record if there is "any credible evidence" to support the allegation and only holding the county DSS to a higher "preponderance of the evidence" standard *after* a subject loses an opportunity for employment.

To summarize, the statutory framework for the Central Register sets out the following procedural steps for the placement of an individual's name on the list:

1. *Hotline*

 Phone call to Central Register hotline, which requires the operator to make a determination on the complaint about whether to pass it on to the appropriate county DSS.

2. *Investigation*

 County DSS investigation, which must be completed in 60 days, and must determine whether a complaint is "unfounded" or "indicated" based on "some credible evidence."

3. *State DSS Review Upon Request*

 If "indicated," the subject of the report has 90 days to request that the report be expunged. If a request is made, the state DSS has to conduct a review, determining whether there is "some credible evidence" for the allegations.

### 4. Administrative Hearing

If the expungement request is denied, an administrative hearing is held where the local DSS must prove the allegations by "some credible evidence."

### 5. Article 78 Proceeding

If the expungement request is again denied, the subject can commence an Article 78 proceeding, under the "arbitrary and capricious" standard.

### 6. Second Administrative Hearing

This is only for those who are denied employment based on their placement on the list. The hearing is to determine whether the person's record will be sealed in the future, although the name would still be on the list. The standard of proof in this hearing is "fair preponderance of the evidence."

 The standards for evaluating the constitutionality of these procedures are clear. In *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the Supreme Court articulated a three-factor test for evaluating administrative procedures, requiring examination of: (1) the nature of the private interest affected by the official action; (2) the risk of error and the effect of additional procedural safeguards; and (3) the governmental interest. We must balance these factors to determine "when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness." *Id.* at 348, 96 S.Ct. at 909. The *Mathews v. Eldridge* factors relating to personal and government interest will be considered initially, followed by the more pertinent discussion of the risk of error caused by the procedures established by the state.

### A. Private Interest

 Valmonte's argument in support of her private interest at stake is basically her argument in support of her liberty interest; that is, her interest in securing future employment in the child care field free from the defamatory label placed upon her by the state. She also asserts that her interest in the raising of her children is an implicated liberty interest, even though nothing in the Central Register impacts directly on her role as a parent, rather than her potential role as a child care worker. Although we disagree that her interest in child-rearing is implicated, Valmonte does have a legitimate interest in pursuing her chosen occupation. *See generally Greene v. McElroy*, 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959).

### B. Countervailing State Interest

 Valmonte does not seriously challenge that the state, as *parens patriae*, has a significant interest in protecting children from abuse and maltreatment. We need not discuss at length the unfortunate reality that children are often victimized, and that the state has a strong interest in protecting them from the infliction of physical harm by those charged with their care. *See Santosky v. Kramer*, 455 U.S. 745, 766, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599 (1982) (noting state's interest in protection of children). We agree with the appellees that there is a significant interest on the part of the state in maintaining the existence of the Central Register.

### C. Risk of Erroneous Deprivation

 The deciding factor in this case, the one that clearly shows the inadequacy of the procedural protections established by the state, is the enormous risk of error that has been alleged by Valmonte and acknowledged by the appellees. As noted earlier, the state only requires that the local DSS meet the "some credible evidence" standard in order to initially include a subject on the Central Register or to keep the subject on the list at the non-deprivation administrative hearing. It is only later, at the post-deprivation hearing, when the subject has already been denied employment due to his or her inclusion on the Central Register, that the local DSS is required to prove the allegations against the subject by a "fair preponderance of the evidence."

The distinction between the two standards is significant. Valmonte points out that, according to her figures, nearly 75% of those who seek expungement of their names from the list are ultimately successful. Half of that number obtain expungement only after they have lost employment or prospective employment because of their inclusion on the

Central Register. This means that roughly one-third of those initially placed on the Central Register are eventually removed once the local DSS is required to prove the charges against the subject by a fair preponderance of the evidence. The fact that only 25% of those on the list remain after all administrative proceedings have been concluded indicates that the initial determination made by the local DSS is at best imperfect.

Much of this unacceptably high risk of error must be attributable to the standard of proof required at the initial determination, and at the non-deprivation hearing. The "some credible evidence" standard does not require the factfinder to weigh conflicting evidence, merely requiring the local DSS to present the bare minimum of material credible evidence to support the allegations against the subject. In contrast, the "fair preponderance" standard allows for the balancing of evidence from both sides, and gives the subject the opportunity to contest the evidence and testimony presented by the local DSS. As the Supreme Court has noted, the preponderance of the evidence standard indicates that the litigants should share the risk of error, *Santosky*, 455 U.S. at 755, 102 S.Ct. at 1396, rather than have one litigant bear the brunt of the risk. Under the instant statutory scheme, however, the individual, not the state, bears the risk.

The "some credible evidence" standard is especially dubious in the context of determining whether an individual has abused or neglected a child. Such determinations are inherently inflammatory, and "unusually open to the subjective values of" the factfinder. *Santosky*, 455 U.S. at 762, 102 S.Ct. at 1399. They are especially open to such subjectivity when the factfinder is not required to weigh evidence and judge competing versions of events, and where one side has the greater ability to assemble its case. *See id.* at 763, 102 S.Ct. at 1400.

Considering the minimal standard of proof, and the subjective nature of the inquiry, it is not altogether surprising 75% of those who seek expungement are ultimately successful. Another fact adduced at oral argument and noted in the record is that there are roughly 2,000,000 individuals on the rolls of the Central Register. This staggering figure has been cited to us by Valmonte, but it was not contested at oral argument. We find it difficult to fathom how such a huge percentage of New Yorkers could be included on a list of those suspected of child abuse and neglect, unless there has been a high rate of error in determinations.

The appellees, remarkably, do not challenge these figures, but argue that there is no real deprivation in cases where individuals contest the initial inclusion on the Central Register. According to the appellees, the subjects are not deprived of anything if their names are taken off the list. Moreover, they assert that the fact that reports are eventually expunged demonstrates that the state's procedures are working to correct mistakes in the original determination.

This is an inherently contradictory argument by the state. To argue that the extraordinarily high percentage of reversals supports the fairness of the system, as a desirable feature of that system, is a curious defense of administrative procedures. One does not normally purchase a car from a dealer who stresses that his repair staff routinely services and repairs the model after frequent and habitual breakdowns. If 75% of those challenging their inclusion on the list are successful, we cannot help but be skeptical of the fairness of the original determination.

### D. *Balancing*

We hold that the high risk of error produced by the procedural protections established by New York is unacceptable. While the two interests at stake are fairly evenly balanced, the risk of error tilts the balance heavily in Valmonte's favor. The crux of the problem with the procedures is that the "some credible evidence" standard results in many individuals being placed on the list who do not belong there. Those individuals must then be deprived of an employment opportunity solely because of their inclusion on the Central Register, and subject to the concurrent defamation by state officials, in order to have the opportunity to require the local

DSS to do more than merely present some credible evidence to support the allegations.

### III. *Valmonte's Additional Arguments*

Valmonte makes numerous other arguments in support of her complaint, none of which have merit or are worth discussing at any length.

### CONCLUSION

For these reasons, we reverse the judgment of the district court and remand for further proceedings not inconsistent with this opinion. Although we recognize the grave seriousness of the problems of child abuse and neglect, and the need for the state to maintain a Central Register for ensuring that those with abusive backgrounds not be inadvertently given access to children, we find the current system unacceptable.