**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 19a0177n.06

No. 17-2226

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>BRIAN PALMER,</td><td>)</td><td rowspan="11"><strong>FILED</strong><br>Apr 05, 2019<br>DEBORAH S. HUNT, Clerk</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>    <strong>Plaintiff-Appellant,</strong></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>BILL SCHUETTE; SCOTT LEE TETER,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>    <strong>Defendants-Appellees.</strong></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

**ON APPEAL** FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

**OPINION**

**BEFORE: NORRIS, STRANCH, and LARSEN, Circuit Judges.**

**ALAN E. NORRIS, Circuit Judge.** Plaintiff Brian Palmer, a former Michigan state representative, filed this Section 1983 action against Bill Schuette, the state's then Attorney General, and Scott Teter, an assistant attorney general. The claims stem from a misdemeanor prosecution initiated by the Attorney General charging plaintiff with willful neglect of duty while a government official in violation of Mich. Comp. Laws § 750.478. Plaintiff pleaded no contest and agreed to the use of the criminal complaint as the factual basis for his plea.

In the wake of the plea, the Attorney General posted a press release on his office's website that profiled plaintiff's prosecution. Plaintiff contends that the release contained numerous falsehoods that adversely affected his professional activities. (At the time of the charge, plaintiff no longer served in the legislature.) Plaintiff demanded that the Attorney General remove the press release from the website; he refused to do so. Plaintiff responded by filing the instant three-count complaint against Schuette, who approved the prosecution, and Teter, who investigated, brought the misdemeanor complaint, and appeared at the plea hearing. The complaint alleged that

defendants violated two of plaintiff's rights under the federal Constitution: 1) his Fifth and Fourteenth Amendment right to due process; and 2) his Fourth Amendment right to be free of prosecution without probable cause. The third count raised a state-law claim for defamation.

Defendants filed a Rule 12(b)(6) motion to dismiss. The district court concluded that the defendants were entitled to qualified immunity, granted the motion, and dismissed the federal counts with prejudice. It declined to retain jurisdiction over the state-law claim and dismissed it without prejudice. Plaintiff then filed a motion for reconsideration, which included a request for permission to amend the complaint. The district court denied that motion. Plaintiff appealed.

**I.**

Plaintiff pleaded no contest to the following charge:

> When any duty is or shall be enjoined by law upon any public officer, or upon any person holding any public trust or employment, every willful neglect to perform such duty, where no special provision shall have been made for the punishment of such delinquency, constitutes a misdemeanor punishable by imprisonment for not more than 1 year or a fine of not more than $1,000.00.

Mich. Comp. Laws § 750.478. As the result of his plea, the court sentenced plaintiff to twelve months of probation and 320 hours of community service, which he discharged.

The press release that spawned this litigation reads in part as follows:

> The conviction stems from Palmer using his position as an elected official to assist the ring-leader of a $9 million Ponzi scheme.
>
> The scheme, conducted by API Worldwide, Inc., defrauded more than 150 victims between 2006 and 2012. . . . Palmer cooperated with investigators after losing $400,000 of his own money to one of the API ringleaders in a separate transaction.
>
> . . . .
>
> From July 2006 through January 2012, API Worldwide, Inc. and its operators Jeffrey L. Ripley, 61, of Sparta, and Danny Lee VanLiere, 62, of Grand Rapids, ran a Ponzi scheme promising huge returns on investments. The two west Michigan men promised high returns on money invested, but never delivered on their promises to victims. . . .

Ripley and VanLiere targeted elderly investors with their scam. An investigation revealed they preyed on elderly victims by convincing them to cash in certificates of deposit (CD's) and other legitimate investments in order to invest the proceeds in API Worldwide. . . . The investigation revealed that although some investors did receive a return, those returns were derived from other investor's funds, the trademark of a Ponzi scheme. None of the victims received any returns on their "investments," and some even lost their life savings.

### Palmer's Role

Palmer served as a state representative from 2002-2008. During that time, Palmer used his position as an elected official to assist Ripley and VanLiere in their Ponzi scheme involving API Worldwide, Inc. Prior to his involvement with API, Palmer had invested $400,000 with Ripley on an unregistered security. Ripley lost Palmer's $400,000 on the investment and assured Palmer that he would get his money back if Palmer helped him with API. Ripley gave Palmer credit for the $400,000 in API investments and Palmer cooperated with API because he believed he would receive a return on his lost funds.

Palmer met with potential investors on behalf of Ripley and API. With the knowledge that Ripley was attempting to circumvent the Securities Act, Palmer did not report the conduct to proper authorities.

Palmer carried a cell phone provided by API and answered calls from potential investors even while on the House floor. To circumvent state security laws, Palmer assisted Ripley by providing documents to make the scheme appear legitimate and signed investment guarantees. And, with Palmer's knowledge, Ripley used Palmer's name and position as a public official to vouch for and sell the API scheme to potential victims.

The release goes on to describe the charge to which plaintiff pleaded guilty and the sentence imposed. It ends with the Attorney General's advice to senior citizens on steps they should take to avoid fraud.

Plaintiff's federal complaint lists the statements contained in the release which he considers to be materially false. As mentioned above, plaintiff agreed to accept the charges set forth in the State's misdemeanor complaint as the factual basis for his plea of no contest. That complaint contains the following summary:

This case is related to People v. API Worldwide Holdings. The scheme is based on the misrepresentation that Dan Hershey has millions of dollars "locked up" in overseas accounts with Lloyds Bank. The schemers then solicited money

3

from "investors" that is supposedly to be pooled with other investors' funds and used to pay off various tax liens, fees, and other charges that are keeping Hershey's Lloyd's Bank account "locked up." Although the promises varied, the schemers usually gave the victims promissory notes that reflect 10% interest and promise a "fee" of many times the initial investment amount. The schemers usually asked for the money on short notice, and assured the "investor" that repayment was 30-90 days away. To date, API has taken in $9,245,814 from over 150 victims from this same scheme from 2006 to the present.

Brian Palmer was a state representative from Romeo in Macomb County at the time of his involvement with API. Palmer told Ripley that Palmer could assist Ripley in moving money from overseas to domestic accounts. In 2006, Palmer wired $11,000 to Dan Hershey for scheme-related expenses. Ripley told Palmer that he wanted to sell API Investments in a way to circumvent Michigan's security's [sic] laws. As a result, Palmer provided Ripley with sample documents for Ripley's use in the scheme including promissory notes and facilitation agreements designed to circumvent [] Michigan's Securities Act. In addition, Palmer carried a cell phone provided by API and answered calls from potential investors even while on the House floor. Palmer was aware that Ripley had advised several potential API "investors" that "State Representative" Palmer was also an investor who was helping API unlock the Lloyds' account. Interviews of investors confirmed that Ripley used Palmer's name and position as a public official to vouch for and sell the API scheme. Investors stated that Palmer's name provided legitimacy to the API investment. Palmer also acted as a guarantor for API "investor" Bob Carlton in 2007. The API investment paperwork was structured as a loan from the Investor to API. Palmer was guaranteeing that if API didn't repay Carlton with interest, that Palmer would repay Carlton. During the same time period according to records at the Office of Finance, Insurance and Regulation (OFIR), Palmer reported another securities scheme to OFIR but never reported API. Finally, Ripley owed Palmer $400,000 from a previous loss that Ripley repaid Palmer with API securities. Therefore, Palmer believed if he cooperated with the API scheme and it was successful, he would get that money back.

Despite these allegations, which he conceded are true, plaintiff's complaint asserted that they do not support several statements made in the press release: plaintiff denies that he pleaded no contest to a Ponzi scheme; "assisted two other men to operate a $9 million Ponzi scheme that defrauded more than 150 persons between 2006 and 2012"; "used his position as an elected official to assist" in a fraudulent scheme; invested $400,000 in an unregistered security; "met with potential investors on behalf of Ripley and API, with the knowledge that Ripley was attempting to circumvent the Securities Act, and that Palmer did not report the conduct to proper authorities";

4

"carried a cell phone provided by API and answered calls from potential investors even while on the House floor"; provided documents to make the API scheme appear to be legitimate; and, lastly, allowed Ripley to use "Palmer's name and position as a public official to vouch for and sell the API scheme to potential victims." Compl. ¶¶ 24-32.

Defendants filed a motion to dismiss pursuant to Federal Rule 12(b)(6). They contended that the Eleventh Amendment precluded any official capacity claims, that they were entitled to qualified immunity with respect to individual capacity claims, and that they were entitled to immunity with respect to the state-law claim. The district court granted that motion. It also denied plaintiff's subsequent motion to reconsider and to amend the complaint.

## II.

### Standard of Review

We "review the grant of a motion to dismiss under Rule 12(b)(6) *de novo*, construing the record in the light most favorable to the non-moving party and accepting as true all well-pleaded allegations in the complaint." *Republic Bank & Tr. Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 246 (6th Cir. 2012) (citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to . . . allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

### Did the Complaint State a Viable Due Process Violation?

The first count of the complaint charges that "[b]y falsely prosecuting Palmer by press release, defendants violated Palmer's due process rights under the Fifth and Fourteenth Amendments." Compl. ¶ 44. As the result of this constitutional violation, plaintiff alleges these injuries:

As a direct and proximate result of the defendants' violations of Palmer's constitutional rights, Palmer suffered severe and substantial damages. These damages include, but are not limited to, loss of earnings and loss of earnings capacity, lost business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish, and distress.

Compl. ¶ 47.

The district court explained the well-known contours of qualified immunity: "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citation omitted). The Supreme Court has recently reminded us that courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Before turning to due process itself, the court first determined that plaintiff incorrectly cited both the Fifth and Fourteenth Amendments as the source of his right to due process. While the Fifth Amendment undeniably contains a due process guarantee, it applies to federal, not state, officials and thus the district court limited its analysis to plaintiff's claim to the due process protections of the Fourteenth Amendment. *See Scott v. Clay Cty.*, 205 F.3d 867, 873 n.8 (6th Cir. 2000).

The court then summarized the essence of plaintiff's claim in these terms: "Plaintiff maintains that he has a clearly established liberty interest protected by the Due Process Clause of the Fourteenth Amendment with respect to his good name, reputation, honor, and integrity." *Palmer v. Schuette*, No. 14-14820, 2016 WL 5477260, at \*4 (E.D. Mich. Sept. 29, 2016) (citing *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972); *Wisconsin v. Constantineau*, 400 U.S. 433,

437 (1971)). However, the court noted that subsequent cases, specifically *Paul v. Davis*, 424 U.S. 693 (1976), clarified that more than defamation is required to state a claim: "the defamation had to occur in the course of the termination of employment." *Paul*, 424 U.S. at 710. The district court reasoned that, pursuant to *Paul*, the due process protection of a person's good name is triggered only when a plaintiff establishes that there had been a stigma to his reputation, a state action altering or extinguishing a right or status previously recognized by state law, and a contemporaneous tangible loss. *See Paul*, 424 U.S. at 708-12. The Supreme Court further clarified the scope of viable due process claims in *Siegert v. Gilley*, 500 U.S. 226, 234 (1991) ("[S]o long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a [federal] action.").

The district court construed these cases to require a change in the status of a protected interest, such as employment. In the instant case, the court noted that the complaint did not allege that plaintiff's employment status was affected by the press release: "[a] stigma to reputation that affects only future employment opportunities does not give rise to a protected liberty interest." *Mertik v. Blalock*, 983 F.2d 1353, 1363 (6th Cir. 1993).

Having had the benefit of the parties' briefs to this court, we affirm the judgment of the district court for the reasons given in its orders granting defendants' motion to dismiss and denying plaintiff's motion for reconsideration.[1] *Palmer v. Schuette*, No. 14-14820, 2016 WL 5477260, at *3-5 (E.D. Mich. Sept. 29, 2016); *Palmer v. Schuette*, No. 14-14820, 2017 WL 3977864, at 2-5

---

[1] Our disposition would not change even if we were to accept the allegations that plaintiff made for the first time in his combined motion to amend his complaint. There, he alleged that he is "self-employed as a partner and the president of his own venture capital company," was so employed at the time of the defamatory press release, and as a result of the press release, lost business. But plaintiff still has not shown that he has been deprived of a governmental right, benefit, or entitlement; he has presented no support for a conclusion that damage to or loss of self-employment is a violation of a clearly established constitutional right.

7

(E.D. Mich. Sept. 11, 2017). Despite plaintiff's protests to the contrary, the disputed press release did not differ to any great extent from the factual statement contained in the misdemeanor complaint. In fact, plaintiff filed a parallel defamation action in the Michigan Circuit Court, which granted summary disposition to defendants: "Taken together, the complaint and the transcript [of his state court plea and sentencing hearings] establish that the allegedly false and defamatory statements in the Press Release were substantially, if not entirely, true." *Palmer v. Schuette*, Mich. Cir. Ct., No. 2016-4357-NO, June 7, 2017, at 16. While a state-law defamation action does not control the outcome of a federal due process claim, it provides some perspective into the validity of the claims advanced by plaintiff.

Fourth Amendment Claim

Count Two of the complaint alleges the following constitutional violation:

By prosecuting Palmer by press release, where the allegations in the press release falsely accused Palmer of a crime he did not commit, the defendants have violated Palmer's right under the Fourth Amendment to be free from prosecution for an offense where there is no probable cause to charge him with the offense.

Compl. ¶ 54.

The district court held that plaintiff had failed to establish the existence of such a constitutional right. *Palmer v. Schuette*, No. 14-14820, 2016 WL 5477260, at \*8 (E.D. Mich. Sept. 29, 2016). In doing so, it rejected plaintiff's reliance on *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). In *Bivens*, the Court held that a plaintiff could seek damages against federal agents who violated the Fourth Amendment in the execution of a search even though no prosecution ensued. 403 U.S. at 397. Here, however, there was no search or seizure, and plaintiff's contention that the press release is analogous to an unconstitutional search or seizure is strained at best.

8

Plaintiff refers us to *Katz v. United States*, 389 U.S. 347, 350 (1967), and argues that a Fourth Amendment right extends to wiretapping even where, as here, there is no *physical* intrusion into a protected space and that probable cause is required before such an invasion of privacy. Plaintiff, however, does not allege any unlawful surveilling or wiretapping occurred and has not established a reasonable expectation of privacy.

Plaintiff also points to *Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994), which hinged on a state-law requirement to report child abuse and neglect. However, that case did not involve the Fourth Amendment.

In short, the allegations and case law brought forward by plaintiff fail to state a claim under the Fourth Amendment.

Pendent Jurisdiction

Plaintiff asks this court to reinstate his state-law defamation claim in the event that we reverse the judgment of the district court with respect to his federal claims. Given that we affirm the judgment on the federal claims, we need not reach this issue.

**III.**

The judgment of the district court is **affirmed**.