NORTH SHORE REALTY TRUST & another[1] *vs.*
COMMONWEALTH.

Middlesex. April 2, 2001. - May 14, 2001.

Present (Sitting at Northampton): MARSHALL, C.J., GREANEY, SPINA, COWIN,
SOSMAN, & CORDY, JJ.

*Eminent Domain,* Damages, Interest, Right to damages. *Zoning,* Lot, By-law.
   *Statute,* Construction. *Practice, Civil,* Costs, Proceeding against Com-
   monwealth, Eminent domain proceeding. *Damages,* Interest, Eminent
   domain. *Interest. Words,* "Lot."

A Superior Court judge's interpretation of a city's zoning ordinance to define
   a parcel of land bounded on one side by a river as a "lot" was a reason-
   able construction of the term "lot" as a unit of property capable of
   identification and measurement within defined boundaries including the
   possibility of natural boundaries. [110-113]
In an action to recover costs of an eminent domain taking by the Com-
   monwealth, a landowner who was entitled to compensation for such taking
   under G. L. c. 79, § 14, was also entitled to recover costs pursuant to G. L.
   c. 79, § 38; consequently, this court remanded the case to the Superior
   Court for an assessment of costs to be added to the judgment in favor of
   the landowner. [113-116]


CIVIL ACTION commenced in the Superior Court Department on
September 15, 1997.

The case was tried before *Hiller B. Zobel,* J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Neal C. Tully* for the plaintiffs.

*Matthew Q. Berge,* Assistant Attorney General, for the
Commonwealth.

SOSMAN, J. The issues on appeal of this eminent domain case
are whether the subject parcel is a "lot" under the Cambridge
zoning ordinance and whether the plaintiff is entitled to costs
against the Commonwealth. We conclude that the property is a
"lot" and that G. L. c. 79 entitles the plaintiff to costs.

---

[1]David R. Grace, trustee of North Shore Realty Trust.

1. *Facts.* On June 20, 1997, the Metropolitan District Commission (MDC) took by eminent domain a parcel of property owned by North Shore Realty Trust (North Shore) in the North Point section of Cambridge. The property is bounded on one side by the Charles River and on the other sides by property of the Boston and Maine Railroad and property already owned by the MDC. At the time of the taking, the parcel was improved with a series of interconnected warehouses.

North Shore commenced an action in the Superior Court for compensation for the land taken. During trial, the MDC contended that property bordering on the river could not constitute a "lot" under the Cambridge zoning ordinance, that North Shore's parcel therefore could not qualify for any uses or forms of development under the ordinance, and that its value was thus limited to the value inhering in the current use. North Shore contended that the property was a "lot" and valued the property based on its development potential under the ordinance.

The trial judge, apparently seeking to avoid any risk of retrial, instructed the jury to render two separate verdicts: one determining the value of North Shore's property assuming it was a "lot" under the ordinance, and the other determining the value assuming the property was not a "lot." The jury returned verdicts finding a value of $7,276,000 if the land qualified as a "lot" and a value of only $4,748,490 if the land did not qualify as a "lot." The judge adopted North Shore's interpretation of the ordinance and entered a final judgment based on the higher value. North Shore moved for an award of costs under G. L. c. 79, § 38, which was denied.

The MDC appealed from the judge's determination that the land was a "lot" under the ordinance, and North Shore cross-appealed the denial of costs. We transferred the case to this court on our own motion.

2. *Definition of a "lot."* The Cambridge zoning ordinance permits, restricts, or prohibits various uses of property based on the dimensions, location, and characteristics of the "lot" under consideration. The "lot" is thus the basic unit of reference for much of the ordinance. Article 2 of the ordinance defines a "lot" as "[a] parcel of land in identical ownership throughout, bounded by other lots or by streets, which is designated by its

owner to be used, developed or built upon as a unit." This definition applies throughout all sections of the ordinance, including art. 16 regulating development of the "North Point Residence, Office and Business District," in which the subject parcel is located.

The MDC contends that the subject parcel is not included within the definition of "lot" because it is bounded on one side by the Charles River, whereas, under the definition, a "lot" must be bounded by "other lots or by streets." Because a waterway is neither a "lot" nor a "street," property that abuts a waterway can never, according to the MDC, constitute a "lot." The MDC argues that the ordinance is clear and unambiguous and that the court cannot treat natural boundaries as boundaries of a "lot."

The definition of "lot" is neither clear nor unambiguous. Rather, it includes a completely circular self-reference, i.e., a "lot" is a parcel bounded by "other lots." While it is clear that a parcel bounded on all sides by streets would qualify as a "lot," the definition does not require that all "lots" be bounded by streets. Rather, they may be bounded (either completely or partially) by "other lots," whatever they are.

Some modicum of common sense must be used to provide meaning to this circular definition. The interpretation urged by the MDC would lead to absurd results, results that are inconsistent with even the most casual observation of existing land uses in Cambridge. If a parcel with a natural boundary is not a "lot," then any abutting parcel not separated by a street cannot be a "lot" either, as one of its bounds would not be a "lot." That failure to qualify as a "lot" would in turn cause the next set of abutting parcels to fail the definition, and so on. Ultimately, the only way to ensure that a parcel would qualify as a "lot" would be to surround it with streets on all sides, as only a street could insulate the parcel from the spreading contagion of parcels that did not qualify as "lots." Cambridge contains various waterways and, therefore, many parcels abutting waterways from which this domino effect of failed "lots" could start. Under the MDC's interpretation, large swaths of

Cambridge have no allowable uses under the ordinance because they are not "lots."[2]

The MDC's analysis also misconstrues the purpose of the term "lot." Under the ordinance, a parcel does not qualify or fail to qualify for various uses based on whether or not it is a "lot," but rather based on the dimensions, location, and characteristics of the parcel — e.g., square footage, or frontage. Thus, a "lot" may be too small for a particular use, but there is no suggestion that any parcel would not even constitute a "lot." Rather, the definition merely identifies what is to be measured to determine whether those dimensions do or do not qualify for certain uses or trigger certain other requirements. The definition of "lot" prevents an owner from lumping together parcels that are not contiguous, or parcels that are split by a roadway, for purposes of taking the requisite measurements. It does not itself purport to set some minimum requirement.

"We will not adopt a literal construction of a statute if the consequences of such construction are absurd or unreasonable. We assume the Legislature intended to act reasonably." *Champigny* v. *Commonwealth*, 422 Mass. 249, 251 (1996), quoting *Attorney Gen.* v. *School Comm. of Essex*, 387 Mass. 326, 336 (1982). "If a liberal, even if not literally exact, interpretation of certain words is necessary to accomplish the purpose indicated by the words as a whole, such interpretation is to be adopted rather than one which will defeat the purpose." *Champigny* v. *Commonwealth, supra,* quoting *Lehan* v. *North Main St. Garage*, 212 Mass. 547, 550 (1942). "Zoning by-laws must be construed reasonably. . . . [S]uch by-laws should not be so interpreted as to cause absurd or unreasonable results when the language is susceptible of a sensible meaning." (Cita-

---

[2]There is nothing in the record to suggest that the city of Cambridge agrees with such an interpretation, and the extensive development of Cambridge in the vicinity of bodies of water strongly suggests that the city has never so interpreted its ordinance. The ordinance, with its definition of "lot," has been in effect for almost forty years. The MDC points out that, at least theoretically, existing development on parcels that would not be "lots" may all have occurred by way of a zoning variance. Given the stringent requirements for obtaining a variance, see G. L. c. 40A, § 10, the suggestion that so much of Cambridge has been developed pursuant to the repeated grant of zoning variances is most unconvincing.

tions omitted.) *Green* v. *Board of Appeal of Norwood*, 358 Mass. 253, 258 (1970).

The reasonable construction of the Cambridge zoning scheme is that a "lot" is a unit of property capable of identification and measurement within defined boundaries. While the most common forms of a boundary will be streets or boundary lines between neighboring parcels, the term "lot" must, of necessity, also recognize the possibility of natural boundaries, such as rivers. Under this reasonable interpretation, the subject parcel is a "lot." That one of its boundaries is the Charles River may have a host of other consequences affecting development (e.g., compliance with wetlands protection requirements), but it is not eliminated from the entire Cambridge zoning scheme by any failure to constitute a "lot." The judgment below, premised on the assumption that the North Shore property is a "lot," is affirmed.

3. *Costs.* Costs "shall be allowed as of course to the prevailing party" in a civil action, but "costs against the Commonwealth, its officers, and agencies shall be imposed only to the extent permitted by law." Mass. R. Civ. P. 54 (d), as appearing in 382 Mass. 821 (1980). The rule "requires that an award of costs against the Commonwealth be based on specific affirmative authority." *Broadhurst* v. *Director of the Div. of Employment Sec.*, 373 Mass. 720, 722 (1977).

In eminent domain cases, there is affirmative authority for awarding costs against the Commonwealth. A taking by eminent domain may be effected by "[a] board of officers upon whom authority to take real estate by eminent domain on behalf of any body politic or corporate has been conferred by law." G. L. c. 79, § 1. The Commonwealth is a "body politic," and is obviously one of the entities that may take property by eminent domain. A person entitled to compensation for such taking may bring a petition under G. L. c. 79, § 14, to assess damages. If a petitioner is successful, the obligation of the taking entity to pay costs is expressly set forth in two separate sections. Where the adjudicated damages exceed the amount of the payment or offer of payment previously made by the taking body, "all taxable costs accruing subsequently to such payment or to such written offer of payment shall be recoverable by the petitioner."

G. L. c. 79, § 8A. With specific reference to actions brought under § 14 (the section under which the present action was commenced), the statute provides: "In *all* proceedings brought under section fourteen, if a petition is filed after an award of damages has been made and the damages are increased . . . [the petitioner] shall recover costs, which shall be taxed as in actions at law" (emphasis added). G. L. c. 79, § 38. The term "all actions brought under section fourteen" is sufficiently specific to include actions against the Commonwealth, one of the public bodies that is commonly involved in such takings.

The MDC argues that the language of G. L. c. 79, § 38, must be contrasted with the more express reference to "the commonwealth" in the section governing interest on eminent domain judgments: "A judgment, whether against the commonwealth or any other body politic or corporate, shall bear interest at the rate calculated pursuant to the provisions of this section from the date of the entry of such judgment to and including the last day of the month prior to the month in which such judgment is satisfied, except that a judgment against the commonwealth shall not bear interest if it is satisfied within thirty days of such entry." G. L. c. 79, § 37. The express reference to the Commonwealth in § 37 is explainable, at least in part, by the fact that there is a unique provision precluding interest if the Commonwealth, as opposed to any other taking authority, pays the judgment promptly.

More importantly, the MDC's argument ignores the history underlying awards of interest and costs against the Commonwealth in eminent domain proceedings. In *General Elec. Co.* v. *Commonwealth*, 329 Mass. 661 (1953) (*General Electric*), this court interpreted an earlier version of the statute as not allowing any award of interest against the Commonwealth. While the eminent domain statute awarded interest "except as herein otherwise provided," another section set forth the mechanism for payment in cases against the Commonwealth, a mechanism that expressly allowed for costs but that did not include interest. *Id.* at 663. Where the technical steps to be followed in obtaining payment from the Commonwealth provided no method by which the petitioner could obtain interest, the court concluded that there had not been any waiver of sovereign immunity with

respect to interest. *Id.* at 664. Ironically, the court noted that the payment provisions did include payment of "costs," and relied on that precise distinction — the express inclusion of "costs" in contrast to the failure to mention "interest" — in support of its conclusion that interest could not be awarded against the Commonwealth. *Id.* at 663.

The Legislature ultimately overruled our *General Electric* decision by rewriting G. L. c. 79, § 37, expressly allowing interest awards against the Commonwealth. St. 1964, c. 548, § 2. However, where *General Electric* had noted that the existing statutory provisions already allowed recovery of costs, there was no need to make any comparable amendment to the sections governing costs. Thus, the express reference to "the commonwealth" in § 37 does not suggest that the reference in § 38 to "all cases" should not include cases against the Commonwealth.

Similarly, the reference to interest, but not to costs, in G. L. c. 79, § 22, does not suggest that the Legislature intended a change from the established procedure of awarding costs against the Commonwealth in eminent domain cases. Section 22 explains the current procedure for obtaining payment from the Commonwealth after judgment, namely, that the clerk shall send to the comptroller a certificate of judgment "showing the amount due from the commonwealth." After receiving the certificate from the clerk, the comptroller is then to notify the Governor, who shall draw a warrant for that amount on the State Treasurer, who shall then pay the amount, "with such interest as is authorized by [§ 37]." G. L. c. 79, § 22. The express reference to the "interest" allowed by § 37 is necessary because, unlike the costs already set forth in the original judgment, interest continues to mount until the judgment has been paid. See G. L. c. 79, § 37. Thus, interest accrues while the certificate of judgment from the clerk wends its way from the comptroller, to the Governor, and ultimately to the State Treasurer. At the time payment is actually made, the Treasurer is responsible for calculating the amount of interest, and § 22 makes that obligation express. The costs, however, are already included as part of the judgment, having been awarded in a fixed amount under § 38 and set forth in the clerk's certificate.

There is no further calculation or adjustment of costs to be made by the Treasurer, and the absence of any separate reference to costs in § 22 does not override the express inclusion of costs in § 38.

As illustrated by *General Electric, supra,* the Commonwealth has paid costs in eminent domain cases for many years. Amendments to the eminent domain statute to allow petitioners to recover interest from the Commonwealth, and to provide a mechanism for calculating and paying that interest, do not convince us that the Legislature ever intended to retract the long-standing waiver of sovereign immunity with respect to costs. Accordingly, the matter will be remanded to the Superior Court for an assessment of costs, which are to be added to the judgment in favor of North Shore.

*So ordered.*