## ADELE LINDSAY *vs.* DEPARTMENT OF SOCIAL SERVICES.

Bristol. April 10, 2003. - July 17, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Abuse Prevention. Department of Social Services. Administrative Law,* Proceedings before agency, Regulations, Substantial evidence. *Statute,* Construction. *Due Process of Law,* Administrative hearing, Child abuse. *Words,* "Neglect," "Injury."

This court concluded that the regulatory definition of "neglect" promulgated by the Department of Social Services (department) allowed the department to identify and provide services to any child whose caretaker was failing to provide a "minimally adequate" level of "essential" care for that child; consequently, the court rejected the contention by the owner and director of a day care center that the department was powerless to act merely because less than "minimally adequate" care had not yet resulted in palpable "injury" to a child who, while being transported to the day care enter, was twice left alone and unsupervised in the day care center's vehicle after other children in the vehicle had entered the day care center. [793-797]

Substantial evidence supported the decision of an administrative hearing officer of the Department of Social Services (department) to "support" an allegation that a child had suffered "neglect" at a day care center where, based on all information then available, there was reasonable cause to believe that the child was neglected, and evidence of actual injury was not a prerequisite to the department's supporting the allegation; where there was substantial evidence of the day care provider's negligence in leaving the child alone and unsupervised in the day care center's vehicle; and where the department properly made the assessment that the day care provider's supervision of the child was not "minimally adequate" and that abandoning the child in this fashion constituted "neglect." [797-800]

There was no merit to the contention by a child care provider that a decision of the Department of Social Services to apply a standard for supporting an allegation of neglect ("reasonable cause to believe" that the neglect did occur) violated due process because it was a lesser standard than preponderance of the evidence. [800-804]

CIVIL ACTION commenced in the Superior Court Department on February 17, 2000.

The case was heard by *Charles J. Hely,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Thomas F. McGuire, Jr.,* for the plaintiff.

*William E. Reynolds,* Assistant Attorney General, for the defendant.

SOSMAN, J. Adele Lindsay, the owner and director of a day care center, sought judicial review of the decision of the Department of Social Services (department) to "support" an allegation that a child had suffered "neglect" at that center. See G. L. c. 119, § 51B; 110 Code Mass. Regs. § 4.32 (2000). A judge in the Superior Court affirmed the department's decision, and the present appeal followed. We transferred the case to this court on our own motion. On appeal, Lindsay raises three arguments: (1) that an allegation of neglect cannot be supported unless the neglect has actually caused the child to suffer physical or emotional injury (no such injury having occurred here); (2) that the department's decision was not supported by substantial evidence; and (3) that the standard for supporting an allegation of abuse or neglect, "reasonable cause" to believe that the abuse or neglect did occur (see G. L. c. 119, § 51B; 110 Code Mass. Regs. § 4.32[2]), violates due process because it is a lesser standard than preponderance of the evidence. We reject each of these arguments and therefore affirm the judgment in favor of the department.

1. *Facts.* Following an investigator's report supporting allegations that Lindsay was responsible for two instances of "neglect" of a child, Lindsay sought an administrative appeal of that decision. See 110 Code Mass. Regs. §§ 10.00 (2000). After an evidentiary hearing, the hearing officer upheld the investigator's decision with respect to one of the incidents and overturned the decision with respect to the other incident. The hearing officer's decision was based on the following factual findings, most of which were undisputed.

Adele Lindsay is the operator of two day care centers in Fall River. Adrianna Dockery, between three and four years old at the time of these events, attended the center located on Somerset Street. Lindsay provided transportation for the children to and from the center, carrying up to seven children at a time in her station wagon. Children would ride in the front seat, the rear seat, and in seats located at the back of the vehicle that were accessed through the rear hatch. When bringing children

to the center, the customary procedure was for Lindsay to park the vehicle on the street in front of the facility and sound the horn as a signal. A teacher's aide would then come outside to retrieve the children and escort them into the center. Lindsay would remain in the vehicle with the children until such time as the aide appeared to take over their supervision.

One day in June, 1999, sometime between 8:30 and 9 A.M., Lindsay transported children to the center and parked the vehicle in front as usual. Adrianna was in the farthest seat to the rear. Lindsay sounded the horn and an aide came out to get the children, whereupon Lindsay apparently left the vehicle. The aide retrieved the children, but failed to notice Adrianna in the rear seat and, as a result, abandoned Adrianna, who was buckled into her seat in the vehicle. At around 10:30 A.M., one of the teachers was outside when she heard a child crying. She discovered Adrianna, removed her from the vehicle, and brought her inside the day care center. Her clothes were wet with sweat, but she suffered no other ill effects from the incident.

Approximately one month later, on July 21, 1999, Lindsay was again transporting Adrianna to the center. Another child, age five years old, was in the front seat with Lindsay. Adrianna was again in the rearmost seat. Lindsay parked the vehicle on the street in front of the facility, and the child in the front seat got out and went into the center on her own. Lindsay had not sounded her horn, and no one had yet appeared to retrieve Adrianna. Lindsay got out of the vehicle and proceeded in through the front door. As she was entering, a teacher's aide was coming out and asked Lindsay if she had sounded her horn. Lindsay replied that she had not. Understanding Lindsay's negative response to mean that there were no children to be retrieved, the aide went back to her classroom. Lindsay proceeded to the kitchen, leaving Adrianna in the vehicle.[1]

Another employee leaving the center at sometime between

---

[1]The hearing officer did not credit Adele Lindsay's testimony that she had waited in the vehicle until she saw an aide coming out of the building. One of Lindsay's own witnesses testified that Lindsay's verbal exchange with the aide occurred as Lindsay "was coming in the building." The hearing officer had a sound basis on which to conclude that Lindsay had left the vehicle, with Adrianna still inside, prior to seeing any caretaker come out to retrieve the child.

11 and 11:30 A.M. went by and heard a child whimpering. She discovered Adrianna in the station wagon and ran inside the center calling for someone to give her the keys to the vehicle. Lindsay gave her the keys, and the employee went back out and removed Adrianna from the vehicle. As with the prior incident, other than crying or whimpering while she was alone in the car and emerging with sweaty clothes, Adrianna showed no other adverse effects from this incident.

The hearing officer determined that, as to the first incident of the child being left in Lindsay's vehicle, Lindsay had not neglected the child because Lindsay had transferred responsibility to the aide who had come out and retrieved all of the children except Adrianna. Having made that transfer, Lindsay was no longer Adrianna's "caretaker" at the time the child was abandoned in the vehicle. See 110 Code Mass. Regs. § 2.00 (2000) (defining "[n]eglect" with reference to failure by "caretaker" to take necessary action to provide for child, and defining "caretaker" to include any person "entrusted with the responsibility for a child's health or welfare").

As to the July 21, 1999, incident, the hearing officer found that the department had properly supported the allegation of neglect. Lindsay had not transferred responsibility to any other staff member when she left Adrianna in the vehicle, and her failure to signal to or alert anyone that a child needed to be retrieved was negligent. *Id.* (to constitute "[n]eglect," caretaker's failure to provide for child must be either deliberate or due to "negligence or inability"). While Lindsay characterized the incident as a misunderstanding between herself and the aide who inquired whether the horn had sounded, the hearing officer concluded that any such "misunderstanding" was caused by Lindsay. Lindsay had failed to sound the horn at a time when she knew (or should have known) that a child was still in the car, and when questioned by a staff member about the absence of that signal, Lindsay answered the question literally without informing the aide that there was nevertheless a child in the car. The hearing officer thus held that Lindsay had negligently failed to provide "minimally adequate supervision" for the child at a time when she was the child's sole caretaker,

and that she had therefore "neglect[ed]" the child within the meaning of the department's regulations. See 110 Code Mass. Regs. § 2.00.

2. *Discussion.* a. *Absence of physical or emotional injury.* Lindsay contends that, under G. L. c. 119, §§ 51A and 51B, the department's "jurisdiction" is limited to cases where a child has suffered "physical or emotional injury" as a result of abuse or neglect, and that the department's regulation defining "neglect" is beyond the department's authority because it does not include any prerequisite of actual "injury." The regulation defines "neglect" as "failure *by a caretaker*, either deliberately or through negligence or inability, to take those actions necessary to provide a child with minimally adequate food, clothing, shelter, medical care, supervision, emotional stability and growth, or other essential care" (emphasis in original). 110 Code Mass. Regs. § 2.00. Here, the hearing officer made no finding with respect to "physical or emotional injury" from the alleged neglect, but found a failure to provide "minimally adequate supervision," a form of "neglect" as defined in the regulation.

Lindsay's argument that only neglect causing actual injury can constitute "neglect" of a child for purposes of G. L. c. 119, §§ 51A and 51B, is premised on a parsing of the statute that we do not accept. The first section Lindsay cites, G. L. c. 119, § 51A, requires that persons in certain occupations report suspected incidents of child abuse or neglect to the department. Such persons must make a report when they have "reasonable cause to believe that a child under the age of eighteen years is suffering physical or emotional injury resulting from abuse inflicted upon him which causes harm or substantial risk of harm to the child's health or welfare including sexual abuse, or from neglect, including malnutrition, or who is determined to be physically dependent upon an addictive drug at birth." *Id.* Lindsay reads this clause to cover a child's "suffering physical or emotional injury resulting from . . . neglect," making some resulting "injury" from the "neglect" a threshold requirement for a report to the department. Because the department's

investigation under § 51B is predicated on a § 51A report, Lindsay contends that any finding of "neglect" under that section must similarly be premised on an "injury."[2]

Before turning to the issue of how this reference to "injury" in § 51A is to be interpreted, we agree with the department's contention that § 51A only defines what circumstances trigger the requirement that certain professionals notify the department. It does not purport to cabin the department's own authority to investigate and address cases of child abuse and neglect under § 51B (which requires the department to "investigate and evaluate the information reported"). In other words, even if Lindsay's reading of § 51A were correct, that would only mean that a person who is a required reporter under § 51A would not have to report suspected "neglect" unless the reporter also observed "injury" resulting from that neglect. It would not prevent the department from investigating allegations of neglect if, even in the absence of any "injury," a report had been made.

As to the interpretation of § 51A itself, the department proposes, and we accept, an alternative connecting of the phrases in that section, namely, that a mandated reporter notify the department if a child is "suffering . . . from neglect." Under that reading, "injury" is a necessary component of "abuse" (requiring reporting where a child is "suffering physical or emotional injury resulting from abuse") but not a neces-

---

[2]Lindsay also buttresses her argument by other references to "injury" or "injuries" elsewhere in the statute. For example, she suggests that the requirement that the investigator determine "the nature, extent and cause or causes of the injuries," G. L. c. 119, § 51B (1), confirms that there must be "injuries" for the Department of Social Services (department) to investigate. This reference to "injuries" appears in a list of various things that the investigator is to evaluate, and the list concludes with the catchall "all other pertinent facts or matters." Id. That "injuries" are included in such a list confirms merely that they are "pertinent" to such an investigation, not that they are the sine qua non of such an investigation. Similarly, from the requirement that the investigator evaluate "the risk of physical or emotional injury to any other children in the same household," § 51B (2), Lindsay contends that the child who is the original subject of the report must have suffered actual "injury." To the contrary, that mere "risk of physical or emotional injury" is to be assessed by the department suggests that "risk" alone is a basis on which the department may take action.

sary component of "neglect."[3]

Both readings of this somewhat cumbersome phrase are plausible, but it is the department's proposed reading that best comports with the purpose of the statute and with common sense. The purpose of this statutory scheme is to alert the department to instances where children may have been abused or neglected and, if the department's investigation confirms those reported suspicions, to take steps to protect the child and correct the underlying situation that led to the abuse or neglect. G. L. c. 119, §§ 51A, 51B. Depending on the circumstances, those steps may include the department's taking custody of the child, notifying the district attorney, offering services to the child and the child's family,[4] and notifying other State agencies. G. L. c. 119, § 51B (3), (4), (5), (9), (10). If children are to be protected from "neglect," it makes no sense for the department to wait until neglect has already run its course to the point of producing a physical or emotional injury. The particular form of neglect at issue in this case — lack of adequate supervision — may, in some circumstances, result in no injury at all, but, when it does cause injury, it can do so suddenly and irreparably. For example, a toddler left unsupervised to cross a heavily traveled street may emerge totally unscathed, but may also be run over and killed. If the department is advised of a caretaker's failure

---

[3]This is consistent with the terminology used later in the fourth paragraph of § 51A, which provides that, in addition to professionals required to make a report, others may report to the department if they have "reasonable cause to believe that a child is suffering from or has died as a result of such abuse or neglect." Thus, the department will receive reports concerning children who are "suffering from . . . neglect," who may or may not have also suffered injury from that neglect.

A similar alternative reading addresses other references to "injury" in later sections relied on by Lindsay. Under § 51E and § 51F, information is to be removed from the department's records if "the allegation of serious physical or emotional injury resulting from abuse or neglect cannot be substantiated." While Lindsay reads this as "the allegation of serious physical or emotional injury resulting from . . . neglect," it could also be read as "the allegation of . . . neglect."

[4]For any supported report of child abuse or neglect, the department makes a written "assessment" of the child's (or family's) need for services, see 110 Code Mass. Regs. §§ 5.00 (1996), and if services are appropriate, a "service plan" is then designed and implemented, see 110 Code Mass. Regs. §§ 6.00 (2001).

to supervise such a child, it is nonsensical to suggest that the department can make no finding of neglect and may take no action to address that neglect unless and until a vehicle strikes the child. Other types of neglect — for example, failure to provide a child with basic hygiene — will not inflict any immediate injury but will, over time, lead to a variety of ailments. Again, the department cannot be required to wait until unsanitary conditions in the home or an evident lack of hygiene have led to infection or disease before it may take steps to protect the child from the foreseeable consequences of that neglect. Such an interpretation would make no sense and would instead preclude the department from addressing the underlying neglect while there was still time to prevent injury.[5]

Where, as here, two readings of the statute are possible, we choose the reading that best comports with the statute's apparent intent and purpose, and we reject a reading that would hobble the statute's effectiveness. "The construction of a statute which leads to a determination that a piece of legislation is ineffective will not be adopted if the statutory language 'is fairly susceptible to a construction that would lead to a logical and sensible result.' " *Adamowicz* v. *Ipswich*, 395 Mass. 757, 760 (1985), quoting *Lexington* v. *Bedford*, 378 Mass. 562, 570 (1979). "If a liberal, even if not literally exact, interpretation of certain words is necessary to accomplish the purpose indicated by the words as a whole, such interpretation is to be adopted rather than one which will defeat the purpose." *North Shore Realty Trust* v. *Commonwealth*, 434 Mass. 109, 112 (2001), quoting *Champigny* v. *Commonwealth*, 422 Mass. 249, 251 (1996).

---

[5]Such an interpretation would also be contrary to current Federal requirements. In order to be eligible for Federal funding under the Child Abuse Prevention and Treatment Act, a State must have particular laws governing the reporting, investigation, and treatment of child abuse and neglect, 42 U.S.C. § 5106a(b)(1) (2000), and those laws must utilize a definition of "child abuse and neglect" that comports with the definition set forth in Federal regulations, 45 C.F.R. § 1340.14(b) (2002). Those regulations define "[c]hild abuse and neglect" in a manner that requires a showing of either "harm or threatened harm to the child's health or welfare," and "threatened harm to a child's health or welfare" is in turn defined as "a substantial risk of harm to the child's health or welfare." 45 C.F.R. § 1340.2(d) (2002). Thus, "neglect" must pose a "risk" of harm, but "neglect" is not limited to cases where that "risk" has already materialized into actual harm.

Nothing in the regulatory definition of "neglect" conflicts with the statute, undermines its purpose, or extends the department's authority beyond what the Legislature intended. The Legislature gave the department broad authority to "promulgate regulations to implement the provisions of [G. L. c. 119, §§ 51A-51F]," G. L. c. 119, § 51B (8), and "there is a presumption that the regulation does not exceed the statute which is as strong as the presumption that a statute squares with the Constitution." *White Dove, Inc.* v. *Director of the Div. of Marine Fisheries*, 380 Mass. 471, 477 (1980). "When the Legislature delegates to an administrative agency a broad grant of authority to implement a program of reform or social welfare, the administrative agency generally has a wide range of discretion in establishing the parameters of its authority pursuant to the enabling legislation." *Levy* v. *Board of Registration & Discipline in Med.*, 378 Mass. 519, 525 (1979). "However, an administrative agency has no authority to promulgate rules or regulations that conflict with the statutes or exceed the authority conferred by the statutes by which the agency was created." *Massachusetts Mun. Wholesale Elec. Co.* v. *Energy Facilities Siting Council*, 411 Mass. 183, 194 (1991). Here, the department's regulatory definition of "neglect" allows it to identify and provide services to any child whose caretaker is failing to provide a "minimally adequate" level of "essential" care for that child. 110 Code Mass. Regs. § 2.00. That approach is thoroughly consistent with, not contrary to, the purposes of the statute. We therefore reject Lindsay's contention that the department is powerless to act merely because less than "minimally adequate" care has not yet resulted in palpable "injury" to the child.

b. *Substantial evidence.* Lindsay contends that the hearing officer's decision is not supported by substantial evidence. At the outset, we must clarify the application of the "substantial evidence" standard of G. L. c. 30A, § 14 (7) (*e*), to the standard that governs the department's decision to "support" an allegation of abuse or neglect. An investigator's initial decision to "support" an allegation requires only that there be "reasonable cause to believe that an incident (reported or discovered during the investigation) of abuse or neglect by a caretaker *did occur*"

(emphasis in original). 110 Code Mass. Regs. § 4.32(2). See 110 Code Mass. Regs. § 2.00 (defining "[s]upport" as "to find after an investigation that there is reasonable cause to believe a report" of child abuse or neglect).[6] The phrase "reasonable cause to believe" is in turn defined as "a collection of facts, knowledge or observations which tend to support or are consistent with the allegations, and when viewed in light of the surrounding circumstances and credibility of persons providing information, would lead one to conclude that a child has been abused or neglected." 110 Code Mass. Regs. § 4.32(2). On appeal before the agency, the investigator's decision to "support" an allegation of abuse or neglect is to be reversed by the hearing officer if, "based on information available during the investigation and/or new information not available during the investigation, the [d]epartment's decision was not in conformity with the [d]epartment's policies and/or regulations and resulted in substantial prejudice to the aggrieved party." 110 Code Mass. Regs. § 10.06(8)(c) (1998). Thus, the issue on such an administrative appeal from the investigator's decision is whether, based on all information then available (which may take into consideration information not considered by the investigator during the original investigation), there was — and still is — "reasonable cause to believe" that the child was abused or neglected. When we now look to see whether there was "substantial evidence" to support the hearing officer's decision, G. L. c. 30A, § 14 (7) (e), there need only be "substantial evidence" supporting the conclusion that there was "reasonable cause to believe" that Lindsay neglected Adrianna.

The evidence in this record easily meets that test. In large measure, Lindsay's lack of substantial evidence argument relies on her theory that there had to be some actual "injury" suffered

[6]The statute similarly predicates other department action on a standard of "reasonable cause to believe." See G. L. c. 119, § 51B (3) (department to take child into custody if there is "reasonable cause to believe that the removal of the child is necessary to protect him from further abuse or neglect"); § 51B (4) (department must notify district attorney if department has "reasonable cause to believe" that certain conditions have resulted from "abuse or neglect"); § 51B (5) (department shall offer services to child's family if it has "reasonable cause to believe [child] is suffering from any of the conditions described in the report").

by Adrianna in order for the department to find any "neglect" of Adrianna. For the reasons stated above, evidence of actual injury was not a prerequisite to the department's supporting the allegation, and we therefore need not consider whether the child's crying, whimpering, or copious sweating amounted to a sufficient "injury."

Lindsay next contends that there was not substantial evidence of her negligence in abandoning Adrianna. We disagree. By her own admission, Lindsay did not take the customary action to alert personnel to the child's arrival. She then left the car and went into the center, when she either knew or should have known that there was still a small child buckled into her seat inside the car. When she encountered an employee coming out the door, she confirmed to that employee that she had *not* given the customary signal indicating the arrival of a child, but failed to tell that employee that there was nevertheless a child outside in the vehicle. Both Lindsay and the employee then went inside and, from this record, it appears that Lindsay should have known that the employee did not proceed outside to retrieve the child. The child was Lindsay's responsibility, and she failed to take reasonable measures either to take the child into the center herself or to see to it that someone else did. The evidence readily supports a reasonable cause to believe that Lindsay was negligent.

Lindsay finally contends that this incident did not place Adrianna at any significant risk and that her supervision of Adrianna was therefore not less than "minimally adequate." See 110 Code Mass. Regs. § 2.00. We give great deference to the department's assessment of what degree of supervision is "minimally adequate" and "essential" and, conversely, to the department's assessment whether the particular circumstances surrounding a given incident of abandonment of a child are sufficiently threatening to the child's well-being to make the abandonment qualify as "neglect." See G. L. c. 30A, § 14 (7) (court gives "due weight to the experience, technical competence, and specialized knowledge of the agency"). Here, Lindsay has shown no flaw in the department's assessment, and certainly none that would warrant our reversing that assessment. The potential consequences of leaving a small child in a vehicle,

alone and totally unsupervised, for a period of hours include some that are very grave indeed. In mid-summer, such a child can suffer severe injury, depending on the prevailing temperatures and the amount of time that elapses before the child is rescued.[7] An abandoned child can be abducted or kidnapped. Even if not physically injured, a small child can become truly terrified by such abandonment, a potential all the more likely here because the same child had been abandoned in a similar manner just one month earlier. On each occasion, the amount of time that elapsed before the child was retrieved was a matter of happenstance. But for the fortuity of an employee happening to hear the child's "whimpering," the child could have been left in the car the entire day. We see no reason to disturb the department's determination that abandoning Adrianna in this fashion constitutes "neglect."

c. *Due process.* Lindsay contends that the department's utilization of a "reasonable cause to believe" standard violates due process, arguing that nothing less than a "preponderance of the evidence" standard can comport with due process. See *Care & Protection of Robert*, 408 Mass. 52, 68 (1990); *Valmonte* v. *Bane*, 18 F.3d 992, 1003-1005 (2d Cir. 1994). She claims that the liberty interest at stake is her interest in her license to operate a day care facility, because the department notifies the office of child care services of any supported reports of child abuse or neglect that are alleged to have occurred at a licensed day care facility, see G. L. c. 119, § 51B (9), and because the office of child care services allegedly treats such a supported report as an automatic disqualification for licensure, see 102 Code Mass. Regs. § 1.05(1)(a)(4).[8] See *Vaccaro* v. *Vaccaro*, 425 Mass. 153, 160-161 (1997), and cases cited (interest in reputation not

---

[7]There was some evidence suggesting that the car windows were open, so that the child was not left in a completely closed vehicle. However, there was also evidence that the child's clothes were so wet with sweat that she needed an entire change of clothes, which suggests that the interior of the vehicle was quite hot.

[8]Like the judge below, we are skeptical of Lindsay's allegation that license revocation automatically results whenever the department supports an allegation of abuse or neglect occurring at a licensed day care facility. Rather, pursuant to G. L. c. 28A, § 10 (f), the office of child care services is required to "investigate and evaluate" any notice that the department has supported such a report and "determine whether the facility . . . is being operated in

protected liberty interest unless injury to reputation also causes change in status or rights).[9]

The viability of Lindsay's due process claim is clouded by the fact that she has, in the wake of these proceedings, settled the related licensing proceedings before the office of child care services and, as part of that settlement, has retained a conditional license. Thus, whatever due process ramifications may theoretically lurk in the interplay between a supported report of abuse or neglect under § 51B and the licensing regulations of the office of child care services, we are here confronted with a situation where Lindsay has resolved the dispute over her license with the licensing agency. Due process claims concerning the role played by the department's supported report of neglect in licensing proceedings conducted by a separate agency appear moot in light of that settlement.[10]

We also note that the nature of Lindsay's due process claim

compliance with this chapter and with the rules and regulations." Action concerning a person's license may then be taken if that person "fails to comply with applicable rules and regulations." G. L. c. 28A, § 13.

[9]Access to the department's records is strictly limited, and violation of the confidentiality provisions protecting those records is a criminal offense. G. L. c. 119, §§ 51E, 51F. See Covell v. Department of Soc. Servs., ante 766, 773, 777 (2003). Other than the notice given to the office of child care services, there is no reason to believe that anyone else will learn that the department supported the report against Lindsay.

[10]In a motion for reconsideration, Lindsay also claimed, for the first time, that in addition to the licensing proceedings, the office of child care services terminated her other day care center's participation in a State child care voucher program. She brought a separate action against the office of child care services challenging that termination, but that case resulted in summary judgment for the defendant on the ground that the parties' agreement with respect to the voucher program was terminable by either party without cause. Lindsay did not appeal from that judgment, but settled that claim as part of the settlement of the license proceedings. Other than Lindsay's conclusory allegation that it was the supported report of neglect at one day care center that caused the office of child care services to terminate a contract with Lindsay's other center, there is no evidence suggesting such a causal link. We note that the initial report to the department included allegations of license violations and other improprieties at the center having nothing to do with child abuse or neglect. As a result, the office of child care services was notified and participated in the investigation prior to any decision to support any allegation of neglect. See G. L. c. 119, § 51B (9) (department and office of child care services may "coordinate" respective investigations of child abuse or neglect with investigations of license violations). It is thus unclear whether the department's decision to support the report of neglect played any role

does not involve any infirmity in the procedural protections offered to her by the department's regulations. She had notice, an opportunity to be heard (first by the investigator, and again before the hearing officer), an opportunity to present evidence, and an opportunity to cross-examine witnesses at the evidentiary hearing. The sole defect alleged is the department's use of what she claims is an inadequate standard of proof, not a defect in the procedural protections afforded prior to the rendering of a decision based on that standard. "The due process test requires a balancing of the individual interest at stake and the risk of an erroneous deprivation of liberty or property under the procedures that the State seeks to use against the governmental interest in achieving its goals." *Doe* v. *Attorney Gen.*, 426 Mass. 136, 140 (1997), citing *Aime* v. *Commonwealth*, 414 Mass. 667, 675 (1993). Here, the department utilizes the "reasonable cause to believe" standard for purposes of triggering its formulation of plans to provide appropriate services to a child and that child's family. In formulating and providing such services, the department is merely carrying out its mission to protect and treat children who may be suffering abuse or neglect, and its provision of such services does not deprive anyone of any liberty or property interest. For those purposes, we see nothing constitutionally infirm in the department's utilizing a standard of "reasonable cause to believe" that a child needs such services.[11]

The constitutional defect, if any there be, lies not in the department's use of that standard of proof for its own purposes, but rather in the manner that the office of child care services allegedly denies or revokes a day care facility's license based on the department's decision to "support" an allegation of child abuse or neglect. Put differently, the department has not denied Lindsay due process merely because, in the wake of the department's lawful proceedings, some other agency has denied Lindsay due process. Lindsay's due process claim, if any, is a

whatsoever in the office of child care services terminating Lindsay's contract. Even if it did, claims concerning that contract have also been settled.

[11]We also note that utilization of the "preponderance of the evidence" standard that Lindsay seeks would have no impact on the outcome of the present case, where the facts pertaining to the abandonment of the child were essentially undisputed and, as to the only disputed fact, the hearing officer found Lindsay not to be credible.

claim against the office of child care services for allegedly denying, revoking, or placing conditions on her license without a constitutionally adequate basis.[12] Again, however, having settled her license proceedings, and never having sought review of the decision of the office of child care services concerning her license, we are in no position to assess whether the office of child care services has denied Lindsay due process in the course of those license proceedings. Whatever due process infirmities there may be in the manner that some other agency uses a supported report of abuse or neglect, they do not require the depart-

---

[12]Lindsay's claim is thus readily distinguishable from *Valmonte* v. *Bane*, 18 F.3d 992 (2d Cir. 1994), on which she heavily relies. There, under a single statutory scheme, the State maintained a registry of persons as to whom there was "some credible evidence" that they had abused or neglected a child, and the statute required employers in the child care field to confirm whether any applicant for employment was listed in that registry. *Id.* at 995. If the applicant was so listed, the applicant could not be hired unless the employer made a written record of its reasons for deciding that it was nevertheless appropriate for that applicant to work in the child care field. *Id.* If an applicant was denied employment (or if a current employee was fired) due to listing in the registry, the person so listed could then obtain a hearing at which the agency would have to show "by a fair preponderance of the evidence" that the listed individual committed the alleged abuse or neglect. *Id.* at 997. If the agency failed to make that showing, the person's name would still remain in the registry, but would not be disclosed to future potential employers. *Id.* In short, the statutory scheme at issue in the *Valmonte* case involved actual and irremediable deprivation, with postdeprivation proceedings that did nothing more than protect the listed individual from some future, additional deprivation. Such a scheme was held to violate due process because the risk of erroneous deprivation based on the original "some credible evidence" standard was unacceptably high. *Id.* at 1003-1005.

Here, we are not dealing with a statutory scheme that offers no meaningful process until after deprivation has irrevocably occurred. Rather, we are dealing with two separate agencies, operating under their respective statutes, one of which has licensing authority over Lindsay's chosen profession. That licensing agency cannot revoke or suspend Lindsay's license without according her due process. See *Langlitz* v. *Board of Registration of Chiropractors*, 396 Mass. 374, 376 (1985); G. L. c. 28A, § 13 (office of child care services must conduct license proceedings in accordance with G. L. c. 30A). If that licensing agency denies Lindsay due process, either by utilizing an unacceptably low standard of proof or by some other defect in its proceedings, Lindsay has her full panoply of rights to judicial review, G. L. c. 30A, § 14, and a stay of any license revocation or suspension may be granted in cases involving denial of constitutional rights, see *Keigan* v. *Board of Registration in Med.*, 399 Mass. 719, 720 n.1 (1987); *Gurry* v. *Board of Pub. Accountancy*, 394 Mass. 118, 129-130 (1985).

ment to adopt a higher standard of proof for purposes of its mission to protect and provide services to children.

*Judgment affirmed.*