van Gestel, Allan, J.
This matter is before the Court pursuant to Superior Court Standing Order 1-96 and G.L.c. 200A, Sec. 12; on Biogen Idee MA, Inc.’s Motion for Judgment on the Pleadings, Paper#18. Biogenldec MA, Inc., f/k/a Biogen, Inc. (“Biogen”), seeks a declaration, pursuant to G.L.c. 231 A, Sec. 1, that the December 14, 2005 Decision of the Treasurer and Receiver General (the ‘Treasurer”), affirming the Deputy Treasurer’s September 15, 2005 Decision regarding the audit of Biogen, is ultra vires, invalid, and should be reversed.
What is involved is the interpretation of the “credit balance” exemption of the Massachusetts Abandoned Property Statute, G.L.c. 200A, and certain regulations issued by the predecessor Treasurer. Biogen argues that the present Treasurer’s interpretation of the Abandoned Property Statute is inconsistent with previous regulations. Biogen also claims that the Treasurer’s interpretation is contrary to the statute itself which, it says, exempts the accounts payable credit balances of Biogen from the Abandoned Property statute.
BACKGROUND
The Court begins by including in this background some history of the regulations in place when the Biogen abandoned property audit (the “audit”) began.
When the predecessor Treasurer, Shannon O’Brien, first took office, she found a degree of chaos in her predecessor’s enforcement of the Abandoned Properly Statute. As a result, Treasurer O’Brien appointed a Task Force of state officials and private sector representatives to address her predecessor’s irregularities, to more clearly define the statute and institute a new exemption, to encourage more compliance among companies doing business in Massachusetts, and to heighten awareness of owners of abandoned property.
Among other things, the Task Force examined business-to-business transactions wherein checks issued by one company were never cashed by a second company. This could occur, for example, when a company issues a check in the wrong amount and subsequently issues a second check without removing the original check from its books. Under the then-existing statute, the original check would have been deemed abandoned property, even though the original check did not reflect an existing obligation of the company. This, apparently, was a common situation for many large companies who would write off uncashed checks rather than expend the resources to investigate every such item.
Prompted by the Task Force’s efforts, the Abandoned Property Statute was amended through an Act of August 8, 2000, c. 198. Among other changes, a second paragraph was added to Sec. 5 of c. 200A. It reads:
Notwithstanding the provisions of the preceding paragraph, any outstanding credit balances to a vendor or commercial customer from a vendor resulting from a transaction occurring in the normal and ordinary course of business shall be exemptfrom the provisions of this chapter. This exemption shall not apply to unallocated distributions from securities held by financial intermediaries including, but not limited to, brokers, mutual funds, custodians, trust companies and depositories and owing to unknown beneficiaries but held in the intermediary’s nominee names.
(Emphasis added).[1]
Following the passage of the amendments to c. 200A, Treasurer O’Brien developed regulations to carry out the provisions of the new statute. The regulatory process culminated in May 2001, with the promulgation of the first Abandoned Property regulations. These regulations included definitions of “credit balances” and “commercial customers,” phrases not otherwise defined in c. 200A, as follows:
Credit Balances: Shall include, but not be limited to, any outstanding credits; overpayments; refunds; vouchers; accumulated values in the form of points, discounts, or other incentive type programs; or any other value potentially due and owing to a vendor or commercial customers; whether currently remaining as a credit, previously resolved, revised, expired or issued to the vendor or to a commercial customer as a credit memo or repay *182 ment. Credit balances shall pertain to credits either current or past that are or were owing to a vendor or commercial customer, whether or not those vendors or commercial customers are currently determinable. Credit balances as used in 960 CMR 4.00 shall not include consumer retail credits.
Commercial Customer: Any person who purchases goods or services in connection with the conduct of that person’s business within Massachusetts or through a vendor conducting business in Massachusetts. No individual purchasing goods or services in his/her capacity as a customer at retail shall be considered a commercial customer.
960 CMR 4.02 (May 25, 2001).
The regulations also addressed the commercial customer reporting exemption:
Pursuant to the reporting requirements detailed in G.L.c. 200A, secs. 5 and 7, an exemption shall exist for any outstanding credit balances between vendors or commercial customers resulting from a transaction occurring in the normal and ordinary course of business. This exemption shall apply to all prior and current reporting years.
Credit balances, as defined in 960 CMR 4.02, shall not be considered as abandoned property, in accordance with G.L.c. 200A, Sec. 5. Credit balances, when they arise in the normal and ordinary course of business, may originate from activity such as overpayments, payment mis-postings, volume discounting, customer relations programs, and payments to satisfy other obligations between two commercial customers, and may take the form of credits, credit memos, refunds, vouchers, discount points or programs, and other transactions between the parties.
960 CMR 4.03(13).
In response to Treasurer O’Brien’s educational outreach program, Biogen filed abandoned property reports. As of October 2002, Biogen had reported $220,308.74 of abandoned property. In its reports, Biogen did not list commercial accounts payable credit balances that it believed are exempt from the provisions of the Statute.
The Treasurer’s Office first noticed an audit of Biogen by letter dated September 17, 2003. At the same time, the Treasurer noticed audits of numerous businesses throughout the Commonwealth. By this time, the current Treasurer, Timothy Cahill, had succeeded Treasurer O’Brien.
On January 12, 2004, Biogen was asked to attend an initial meeting with the Treasurer’s abandoned property auditor. The meeting was scheduled for February 9, 2004.
On February 13,2004, Treasurer Cahill filed “emergency” amendments to the abandoned properly regulations then in place. The amended regulations were intended to “offer a different interpretation” of the credit balance exemption from that in Treasurer O’Brien’s regulations.
On June 18, 2004, without having held any public hearings, Treasurer Cahill filed the final version of his amended regulations. The amendments contained newly revised definitions of “Credit Balances” and “Commercial Customers.” They read:
Credit Balances: Outstanding balances that are recorded as current accounts receivable or accounts payable of the holder. The balance must have been generated in the normal and ordinary course of business between the holder and a then-current commercial customer . . .
Commercial Customer: Any person who maintains a current, multiple transactions, commercial relationship with a vendor and the conduct of the person’s business within Massachusetts or through a vendor conducting business in Massachusetts. No individual purchasing goods or services in his/her capacity as a consumer at retail shall be considered a commercial customer.
960 CMR 4.02.
The 2004 amendments further revised the “Exemption for Reporting Certain Credit Balances” enumerated in Sec. 13. First, the exemption no longer applied “to all prior and current reporting years.” Second, the amendment narrowed the interpretation of the credit balance exemption to read:
Credit balances, as defined in 960 CMR 4.02, shall not be considered abandoned property, in accordance with G.L.c. 200A, Sec. 5. Credit balances may originate from activities such as customer overpay-ments and shall include balance sheet credits, such as the payment to vendors for the purchase of goods and services.
960 CMR 4.13(b).
Treasurer Cahill’s audit of Biogen proceeded concurrent with the promulgation of the emergency, and later permanent, amendments to the regulations.
After issuing two preliminary reports, Treasurer Cahill’s auditor issued a final examination report on June 7, 2005. This report reflected $1,420,260.97 in total abandoned property, of which $1,234,601.50 was demandable and $185,659.47 was reportable (i.e., not demandable until after November 1, 2005, pursuant to Sec. 7(d) of c. 200A). $781,251.34 of the total was comprised of a calculation based on either uncashed outstanding or voided checks recorded in Biogen’s accounts payable disbursement records.
Following the issuance of the final examination report, Biogen appealed the Treasurer’s audit finding pursuant to c. 200A, Sec. 12(g). After a hearing, Officer and Deputy State Treasurer Mark Cavanagh (“Mr. Cavanagh”) issued a recommended decision affirming the Treasurer’s audit finding. Among other things, Mr. Cavanagh held that no exemption existed for Biogen’s uncashed accounts payable checks. He explained that *183 an accounts payable credit balance only arises from the “over receipt of goods,” which occurs when a purchaser underpays for goods delivered by a vendor.
Mr. Cavanagh also noted that although the definition of “credit balance” and other terms defined in the May 2001 Abandoned Property regulations “were consistent with the policies and public pronouncement of the former abandoned properly administrator [Treasurer O’Brien],” those definitions “were not consistent with the language of G.L.c. 200A Sec. 5 and the legislative intent of the amendment.” Mr. Cavanagh concluded that:
an agency must . . . when necessary amend the regulation if they conclude the regulations as promulgated do not properly interpret or implement the law the agency administers ... In deference to the original intent of the law, definitions for the terms commercial customer and credit balance were promulgated in June of 2004 to satify the dual requirements of G.L.c. 200A, Sec. 5 and G.L.c. 30A, Sec. 1.
Mr. Cavanagh applied the amended 2004 regulations retroactively to Biogen for not only the years under audit, but also back to 1981, when Biogen incorporated in Massachusetts. This was done, despite prior practice which only looked back ten years.
This action followed the Treasurer’s affirmance of the September 15, 2005 Decision and Recommendation.
DISCUSSION
The Treasurer’s interpretation of the credit balance exemption and other clauses of c. 200A, and the regulations involved with it, are subject to de novo judicial review. Atl. Med. Ctr. v. Comm’r of the Div. of Med. Assist., 439 Mass. 1, 6 (2003).
The Treasurer has
“a wide range of discretion in establishing the parameters of [his] authority pursuant to . . . enabling legislation.” . . . Where, as here, the administrative agency is vested with broad authority to effectuate the purposes of the legislation, [this Court should] give deference to its expertise and experience . . . The principle of according weight to an agency’s discretion, however, is “ ‘one of deference, not abdication,’ and this court will not hesitate to overrule agency interpretations of statutes or rules when those interpretations are arbitrary or unreasonable.”
Moot v. Department of Environmental Protection, 448 Mass. 340, 346-47 (2007). See also Nuclear Metals, Inc. v. Low-Level Radioactive Waste Mgmt. Bd., 421 Mass. 193, 211 (1996); Atl. Med. Ctr., supra, 439 Mass. at 6.
With all due respect to the two Treasurers involved, their entitlement to deference in interpretation of the amended c. 200A here is curbed by the fact that one Treasurer immediately followed the other in office; the first was directly involved in the study that led to the particular amended legislation that was followed by her interpretive regulations, and the second was not himself the beneficiary of any long history of administrative application under the statute. This Court must fall back on more general guideposts for its interpretation of amended c. 200A.
Statutory interpretation is a quintessential judicial responsibility, to be undertaken using well-established guiding principles.
In a recent case, the Supreme Judicial Court summarized the fundamental precepts of statutory interpretation as follows; “ ‘[A] statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.’ . . . Courts must ascertain the intent of a statute from all its parts and from the subject matter to which it relates, and must interpret the statute so as to render the legislation effective, consonant with sound reason and common sense . . .”
DiGiacomo v. Metropolitan Property & Cas. Ins. Co., 66 Mass.App.Ct. 343, 346 (2006).
“A statute should not be ‘unduly constricted so as to exclude matters fairly within [its] scope.’ ” Brittle v. City of Boston, 439 Mass. 580, 585 (2003). At the same time, a Court should interpret a statute according to its plain words; it “may not add words . . . that the Legislature did not put there.” Carmel Credit Union v. Bondeson, 55 Mass.App.Ct. 557, 560 (2002).
When “two readings of a statute are possible," however, the Supreme Judicial Court — and this Court, as well — "chooses the reading that best comports with the statute’s apparent intent and purpose, and [it rejects] a reading that would hobble the statute’s effectiveness." Lindsay v. Department of Social Services, 439 Mass. 789, 796 (2003). In short, “[i]f a liberal, even if not literally exact, interpretation of certain words is necessary to accomplish the purpose indicated by the words as a whole, such interpretation is to be adopted rather than one which will defeat the purpose.” North Shore Realty Trust v. Commonwealth, 434 Mass. 109, 112 (2001), quoting Champigny v. Commonwealth 422 Mass. 249, 251 (1996).
The Court returns to the amended c. 200A, Sec. 5, second paragraph. It reads, in pertinent part: “Notwithstanding the provisions of the preceding paragraph, any outstanding credit balances to a vendor or commercial customer from a vendor resulting from a transaction occurring in the normal and ordinary course of business shall be exempt from the provisions of this chapter . . .” Neither in this sentence, nor *184 anywhere else in c. 200A, is the phrase “credit balance” defined.
Both Treasurer O’Brien and Treasurer Cahill, however, with regulations issued during their consecutive terms in office, have proffered definitions. Their differing definitions present two possible readings of the statute, thereby presenting the situation faced by the SJC in Lindsay, supra, 439 Mass. at 796.
Treasurer O’Brien’s regulations define “credit balances” to
include, but not be limited to, any outstanding credits; overpayments; refunds; vouchers; accumulated values in the form of points, discounts, or other incentive type programs; or any other value potentially due and owing to a vendor or commercial customers; whether currently remaining as a credit, previously resolved, revised, expired or issued to the vendor or to a commercial customer as a credit memo or repayment. Credit balances shall pertain to credits either current or past that are or were owing to a vendor or commercial customer, whether or not those vendors or commercial customers are currently determinable.
Treasurer Cahill’s later regulations define “credit balances”.as
[outstanding balances that are recorded as current accounts receivable or accounts payable of the holder. The balance must have been generated in the normal and ordinary course of business between the holder and a then-current commercial customer . . .
Both definitions can be read as consistent with the wording of G.L.c. 200A, Sec. 5, second paragraph. Treasurer O’Brien’s regulations are broader in their scope; Treasurer Cahill’s wording is more crimped in its reach. Also, Treasurer O’Brien’s regulations were adopted as part of the overall amendment to c. 200A, in which her office was heavily involved. To that extent, her interpretation of the intended reach of the amended Sec. 5 is entitled to at least a modicum of deference by this Court.
A real question in issue in this case is whether there was merit to Treasurer O’Brien’s regulations being read to include within the reach of the Sec. 5 exemption “uncashed accounts payable checks.” This Court thinks there is. And this is a position not wholly rejected by Treasurer Cahill’s staff. There is included in the motion for judgment on the pleadings file an Affidavit of Joan Mitrou, Paper #19. Ms. Mitrou includes as Exhibit 4 a copy of an e-mail communication from Thomas McAnespie to Mark Cavanagh[2] dated February 25, 2003. Its subject is “Credit Balance Exemption” and it reads, in pertinent part, as follows:
When this exemption was passed as part of the 1999 amendment to the act, a very liberal interpretation was adopted by the prior administration. Specifically, by regulation it was extended to all present and prior reporting periods, and by internal policy it was deemed that it would extend to any uncashed accounts payable checks if the holder could demonstrate that the check emanated from what once appeared on the books of the holder as a credit balance . . .
In Exhibit 5 to the Mitrou Affidavit, there is a copy of Mr. Cavanagh’s response, on the same day, to Mr. McAnespie. It reads, in pertinent part, as follows:
I wholeheartedly agree. That situation was posed as one where the two businesses would have an ongoing relationship, which for one reason or another, could end up with one of the credits remaining on the books for an extended period of time. It was never meant to be extended to cases where the credit was reduced to a check, then subsequently not cashed.
A short time later, on April 30, 2003, in Exhibit 6 to the Mitrou Affidavit, Mr. McAnespie again communicated with Mr. Cavanagh on the issue of credit balances. This time he said:
I received a voice mail today from an attorney making inquiry regarding the application of the credit balance exemption to an uncashed vendor check. The prior administration when applying the credit balance exemption extended it to vendor checks when the holder could show that the underlying source of the check was a vendor credit balance.
We certainly can offer a different interpretation at present. If the decision is to say that it does not extend, this is another area where we would have to amend the existing Regs, to lend clarity to the issue.
Not only do the e-mail exchanges between Mr. McAnespie and Mr. Cavanagh give credence to this Court’s reading of the reach of the Treasurer O’Brien regulations,[3] they demonstrate that the regulated public could read and rely on those regulations for just such an interpretation. Thus, on the point of what regulations should apply to the Biogen audit, this Court rules that the new Treasurer Cahill regulations — assuming they ever came into effect[4] — cannot be applied retroactively.
Statutes and regulations, which are each evaluated in the same manner, generally apply prospectively. Figueroa v. Dir. of Dept. of Labor and Workforce Dev’t, 54 Mass.App.Ct. 64, 70 (2002). Absent express language in a statute or regulation directing otherwise, courts should apply a new or amended law or regulation only to events that occur after the change’s effective date. Id. See also Bowen v. Georgetown, 488 U.S. 204, 208-09 (1988); First Fed. Savs. & Loan Assoc., of Gallon, OH v. Napoleon, 428 Mass. 371, 374 (1998). Silence dictates prospectivity. Id.; Child Support Enforcement Div. of Alaska v. Brenckle, 424 Mass. 214, 219 (1997). This concept of applying laws and regula *185 tions prospectively is particularly true when the law or regulation affects property rights. Maynard Realty Corp. v. Testa, 64 Mass.App.Ct. 909, 910 (2005).
There was no express direction for retroactive application of Treasurer Cahill’s regulations, and the Biogen audit, for the years leading up thereto, was already under way when the emergency regulations were first promulgated.
This leaves the Court with G.L.c. 200A, Sec. 5, as amended, and Treasurer O’Brien’s regulations, in assessing the propriety of the Biogen audit.
The Treasurer’s opposition is grounded on the contention that checks and the liquidated contractual obligations they represent are not credit balances. Among other things, the Treasurer points to c. 200A, Sec. 1 which distinguishes between “checks” and “credit balances.” The Treasurer finds this differentiation in the Definitions section of the statute. There, when defining “Property,” the statute reads, in relevant part: “all intangible property, including: (i) money, money orders, checks, drafts, deposits, interest, dividends, income and bonds; (ii) credit balances, customer overpayments, security deposits, refunds, credit memos, unpaid wages, unused airline tickets, mineral proceeds and unidentified remittances; . . .” (Emphasis added.)
This placing of checks and credit balances in different phrases in the definitions subsections in Sec. 1 occurred with enactment of the same St. 2000, c. 198 that amended Sec. 5 to add the second paragraph.
The Treasurer argues that a check is a negotiable instrument, an intangible contractual obligation owed by the maker of the check to the payee. He cites to Treasurer and Receiver General v. John Hancock Mut. Life Ins. Co., 388 Mass. 410, 420 (1983).
A credit balance, on the other hand, the Treasurer contends, is an accounting concept. It is “the status of an account when the sum of the credit entries exceeds the sum of the debit entries.” Black’s Law Dictionary, 374 (7th ed. 1999).
Further, the Treasurer observes that the exemption in Sec. 5 applies only to “outstanding credit balances." “No regulation can expand the exemption to cover credit balances that are not ‘outstanding,’ ” he says. Therefore, since none of the sums embodied in Biogen’s uncashed checks appeared on Biogen’s books as a credit balance, they are not exempted.
Thus, the Treasurer presses the point that since c. 200A, Sec. 5, para. 2 does not define or expressly include checks as credit balances, it was erroneous for Treasurer O’Brien to attempt to do so obliquely by her regulations.
Biogen responds that the catchall phrase “any other value potentially due and owing to a vendor or commercial customer,” found in the 2001 version of 960 CMR Sec. 4.02, is sufficient.
Further, Biogen argues ambiguity in c. 200A Sec. 5 which would have warranted Treasurer O’Brien’s attempt to clarify with her regulations. Certainly the fact that Treasurer Cahill proffered his own, different, regulatoiy interpretation on the very same statutory language supports the ambiguity argument. See President and Fellows of Harvard College v. PECO Energy Co., 57 Mass.App.Ct. 888, 895-95 (2003), wherein, when discussing ambiguity in a contract, the Appeals Court instructed this Court:
Neither party’s interpretation of the contracts commends itself to us to the exclusion of the other. We therefore conclude that the agreements by themselves do not reveal an answer to the question at issue, if indeed there is one. This is the essence of ambiguity. Contract language is ambiguous “where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken.”
Statutory phraseology that can support reasonable difference of opinion as to the meaning of the words employed must certainly qualify as revealing the essence of ambiguity as well.
When considering the background and purpose of the amendment adding a second paragraph to include an exemption for business-to-business transactions to c. 200A, Sec. 5, the question then becomes whether Treasurer O’Brien went clearly beyond the Legislature’s intent. While a very close issue, this Court rules that Treasurer O’Brien’s regulations best comport with c. 200A, Sec. 5’s apparent intent and purpose, and rejects a reading that would hobble the statute’s effectiveness. Lindsay, supra, 439 Mass. at 796. This Court applies “a liberal, even if not literally exact, interpretation of certain words ... [as being] necessary to accomplish the purpose indicated by the words as a whole,... rather than one which will defeat the [statutory] purpose.” North Shore Realty Trust, supra, 434 Mass. at 112, quoting Champigny, supra, 422 Mass. at 251.
ORDER
For the foregoing reasons, Biogen Idee MA, Inc.’s Motion for Judgment on the Pleadings, Paper #18, is ALLOWED.
Biogen is requested to submit a proposed form of final judgment consistent with this Order, to which the Treasurer may have, if he chooses, ten business days from the date of Biogen’s submittal to provide his written comments thereon.

The Legislature also implemented an amnesty program “during which [holders of abandoned property were] not subject to the penalties, fines or interest” under Sec. 12 of c. 200A. St. 2000, c. 198, Sec. 4. The amnesty program included a direction by the Legislature to “the treasurer [to] conduct an outreach and publicity program to notify business entities and other holders of abandoned property of their obligations under the General Laws, and the amnesty program.” Id.

Mr. McAnespie was Associate General Counsel to Treasurer Cahill, a position he also held during the administration *186 of Treasurer O’Brien; and Mr. Cavanagh is the author of the underlying Decision on the Biogen audit. Mr. McAnespie is, apparently, the good soldier who follows orders. Despite his apparent doubts about Treasurer O’Brien’s regulations, he was praised at the public hearing on their adoption as being “very instrumental in helping [Treasurer O’Brien] to draft these regs.” See Transcript of public hearing, May 8, 2001, Mitrou Affidavit, Exhibit 3.

Albeit while expressing their wish to make a change.

This is a point that does not need to be decided in order for this Court’s ruling on the present motion.